# Boyd *against* Eby.

On the trial of a feigned issue of *devisavit vel non* the declarations or admissions of a devisee or legatee to show the incapacity of the testator, are not admissible, whether such person be a party to the issue or not, if he be not the sole devisee or legatee, but there are others having distinct and separate interests under the will, which would be effected by the determination of the issue.

In contemplation of law, a testator is of sound memory when he has understanding to dispose of his estate with judgment and discretion; and this is to be judged of from his words, actions and behaviour at the time. If general lunacy be established, it must be shown, that there was not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind, sufficient to enable the party soundly to judge of the act.

ERROR to the common pleas of *Cumberland* county.

Samuel Boyd, William Boyd and others, against Jason W. Eby and The Associate Synod of North America. Feigned issue of *devisavit vel non* to try the validity of the will of James Neal, deceased.

Upon the trial, the plaintiffs offered in evidence a letter of Jason W. Eby, dated the 10th of March 1838, to Robert Slemmens, one of the plaintiffs, for the purpose of showing his opinion of the condition of the testator at that period. The defendants objected, 1. Because the declarations of one legatee in a will are not evidence in an issue to try its validity, where either may be affected by them. 2. The declarations referred to were before the death of Colonel Neal. The court below overruled the evidence, and sealed a bill of exceptions.

The remaining point was an exception to the opinion of the court below, which was as follows:

To the jury.

1. In law every man is presumed to have sufficient capacity till the contrary appears.

[Boyd v. Eby.]

2. When insanity or derangement is established, it is presumed to continue; and he is supposed to be unable to make a will, until the contrary is proved. In such case the burden of proof lies on the party asserting the validity of the will. The proof, to be available, must show that the mind had shaken off the disease, and had become generally sound; not only upon some particular subject, but entirely.

3. The point to be ascertained from the evidence is, whether James Neal was of "sound and disposing mind and memory" when the controverted paper was made? If so, it is of no consequence that he may have been insane both before and afterwards.

4. The exact amount of mind required, it is not easy, by any language to define. It is easier to understand than define it.

5. There is a difference between a disordered mind and a weak mind—between insanity and imbecility. I understand a difference to exist between mental delusion and inaccuracy of judgment—between error, or mistake, or misapprehension and conclusions founded upon imaginary premises. When a man fancies the existence of facts, or imagines the existence of a particular state of things, and acts upon such fancy or imagination, the mind is disordered—deranged. While such state continues he has not a sound and disposing mind and memory.

But if a man has sufficient intelligence to comprehend facts, compare their various states and conditions, and exercise his own mind upon them, and draw his own conclusions, such are evidences of a sound mind, though he may not apprehend or weigh the facts rightly, though he may misapprehend them; make mistakes, or draw erroneous conclusions, still he may be of sound and disposing mind and memory. He may consult his own wishes, indulge his prejudices, gratify his passions, and still his will be good. Imbecility or weakness, if the mind is not disordered or deranged, will not disable a man from making his will. Suppose in June and before, that Colonel Neal was partially delirious, and in his partial delirium he contracted prejudices, erroneous notions, with regard to Samuel Boyd or others of his relatives. While acting under the mental influences or disorders which produced such prejudices or erroneous notions he would be deemed to be under a delusion and would be incapable of making a will. But suppose he got relieved from the disorders of mind, the deleterious influences that operated upon him, and his mind was restored to its equilibrium, it became again rightly balanced and capable of apprehending and comparing facts and drawing right conclusions, but still retained a prejudice before contracted or then existing, still he would be, in our opinion, capable of making his will, and this in my mind involves the chief difficulty in this case, if there be any.

It is said that Colonel Neal contracted prejudices and erroneous notions in his partial delirium against Samuel Boyd his relative,

[Boyd v. Eby.]

and that in this his mind was acting under the influence of a delusion. We have said that if so, and his mind continued so disordered and to act under its influences, if any delusion existed when the codicil was made, any act done during its continuance would not be good; but if his mind was restored to its proper action before he made this codicil—if he was at that time of sound and disposing mind, though he retained prejudices—retained erroneous impressions against Samuel Boyd, and although they may not have been just, still the codicil might be good. A person may form erroneous opinions in his youth, before his judgment is ripe or in sickness when afflicted with disease, or under the influence of bad associations or ardent spirits; and he may retain such prejudices and errors, and act upon them when he comes of full age, is restored to health, is introduced into better company, or becomes sober; so a man I would suppose might possibly retain prejudices or erroneous impressions, after he is restored to his right mind. which had their origin in delusions occurring under the influence of intemperance or perhaps partial delirium, or at least under a partially disordered state of intellect.

But this case is mainly a question of fact to be determined by the jury. The law is referred to the court; the facts to the jury. The evidence is for your decision, according to law. Were James Neal's mind and memory disordered on the 9th day of March 1837, when the codicil was made? Was that paper made and executed under a mental delusion in reference to any one named in it? If so, it is of no validity. Or was he of sane mind at the time? Had he sufficient intelligence to know what he was doing? Was it the result of his own mind and judgment, rightly exercised so as to satisfy himself, so as to answer his own views and purposes duly understood? If so, it is a good and valid codicil.

We will not comment upon the various parts of the evidence. The spelling of the name, the intemperance of Colonel Neal and other particular acts relied upon, are before you and entitled to their weight. Here the court referred to some of the prominent facts and evidence.

Exception was taken to the charge by the defendants.

*Biddle* and *Williamson*, for plaintiff in error, as to the rejection of the evidence cited 1 *Penn. Rep.* 321; 4 *Watts* 167; 18 *John.* 330; 11 *East.* 586. On the second point 1 *Peters's Rep.* 153; 2 *Law Lib.* 38, 42, 290; *Phil. Ev.* 75.

*Graham* and *Watts*, with whom was *Alexander*, *contra*, cited on the first point, 13 *Serg. & Rawle* 323; 4 *Serg. & Rawle* 499; 5 *Serg. & Rawle* 195; 1 *Mass. Rep.* 71; 1 *Penn. Rep.* 318.

The opinion of the Court was delivered by

SERGEANT, J.—By the codicil, one-half of the residue of the per-

sonal property is .bequeathed to the Associate Synod of ·North America, and the other half to Jason W. Eby, and a devise in the will of one-fourth of an acre of land to the testator's servant, Ann, is revoked.　Jason W. Eby and the Associate Synod of North America·are plaintiffs in this feigned issue of *devisavit vel non*, in. relation to the codicil, and the defendants, for the purpose of estab-. lishing the incapacity of the testator to make the codicil, offered in evidence a letter written by Jason W. Eby, on the 10th of March 1838, to R. Slemmons, one of the defendants, stating the situation, conduct and habits of the testator at that time.　This was objected to by the plaintiffs, and the court rejected it.

The case that comes nearest to the present is that of Dietrich *v.* Dietrich, 1 *Penn. Rep.* 306, where the court was equally divided on the question whether the declarations of Henry Dietrich, one of the devisees, who was. sole party plaintiff in the issue whether the testator was childish, could be received in evidence.　In Bovard *v.* Wallace, 4 *Serg. & Rawle* 499, on the trial of a feigned issue of *devisavit vel non*, the declarations of a devisee, not a party to the suit, that the testator was incapable, were held not to be admissible to invalidate the instrument.　In Nussear *v.* Arnold, 13 *Serg. & ·Rawle* 323, the ;declarations of Mary King, that the testator was incapable of transacting business, were rejected.　She was a prin-. cipal devisee in the will, which gave her the whole estate (except a few legacies to a small amount) for her life, and afterwards one-half to her relations, and one-half to the relations of the testator. C. J. Tilghman says, " if the whole estate had been devised to her, her declarations would have been evidence, because the plaintiff on record was merely her agent.　But she was not the only person interested.　The verdict and judgment would be conclusive as to her personal estate, against all persons claiming under it.　In Dietrich *v.* Dietrich, 4 *Watts* 167, it is said that if the interest ·be joint, admissions by one are evidence against all who are parties ·with him in the suit.　But legatees and devisees have not a joint interest.　One who has thousands involved in the question ought .not to be prejudiced by declarations of one who has not a shilling."

According to the principles recognised· by judicial decisions in our .courts on this subject, it would therefore seem, that on the trial of a feigned issue of *devisavit vel non*, the declarations or admissions. ·of a devisee or legatee, to show the incapacity of the testator, are · not admissible, whether such person be a party to the suit or not, if he be not the sole devisee or legatee, but there are others having .distinct and separate interests from him under the will, which will be affected by the determination of the issue.　Here the interest of the Associate Synod, though equal in amount, is entirely separate · and distinct from that of Jason W. Eby; they are to have one-half, and he the other half; they are not jointly interested in the claim. They are joint parties in .the suit; but that regards only the suit itself and the costs, and not the claim or title under the will; and

[Boyd v. Eby.]

this evidence will affect the latter as well as the former. The interest of one person cannot be affected by the admissions or declarations of another person having a separate interest. Under the decisions of this court, therefore, as well as on principle, we are of opinion that the court below were right in rejecting the letter offered in evidence.

2. The rule of law in regard to wills is, that the memory which the law holds to be a sound memory, is when the testator hath understanding to dispose of his estate with judgment and discretion, which is to be collected from his words and actions and behaviour at the time. *Fonb. Eq.* 71; 6 *Co.* 23; *Dy.* 72; 1 *Ch. Rep.* 13; *Moore* 760. If general lunacy be established, it must be shown that there was not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficient to enable the party soundly to judge of the act. 1 *Ves.* 611.

Incompetency, then, by reason of insanity, is to be sought for in the words, actions and behaviour at and about the time of the act in question. We have no other source to reason from. The internal structure and operation of the mind are inscrutable, and even a physical derangement of the brain (which is usually supposed to be its seat,) is incapable of being ascertained. The *factum* itself is to be considered, whether such as a judicious rational mind would perform; and also, when a general derangement has once existed, it is incumbent on him who alleges restoration of mind, to show that it took place so far as to enable the party to judge soundly of the act he is doing. What conclusion, then, are we to come to in a case where a person, in the full possession of his faculties, has made a will, unexceptionable in its structure and dispositions, bequeathing various pecuniary legacies, and then disposing of the residue of his estate to his nearest relations; and where that person, within the space of two or three months becomes lunatic, and in the paroxysms of his insanity, and in connection with them, imbibes the most violent antipathies against one of those relations, for whom, formerly, he entertained a high regard and affection; which antipathies are proved to be utterly without just cause or foundation, and built upon imaginary grievances; and where this person becoming afterwards relieved from the symptoms of his derangement, yet continues to cherish, on all occasions, these antipathies and perverted impressions, and while under their influence, within nine months after the derangement, adds a codicil to his will, in which he revokes the residuary bequest and gives it all over to persons—strangers to him in blood, though otherwise having some claim upon his bounty? It appears to me, that the only question in such a case is, whether the person was of sound memory and discretion, considering the act done in all its bearings, and judging of the soundness of mind of the supposed testator by his conduct and declarations at the time, and as connected with his previous insanity and the degree of restoration of mind in the interval; and

that if the erroneous and groundless impressions, received during the time of his delirium, shall retain their hold, (whether by some physical derangement of the brain, or by some indelible stamp upon the thinking faculties,) that person must be considered still under a delusion—the effect continues, and it is only by effects we can judge of the existence of the exciting cause—and if he is under a delusion, though there be but a partial insanity, yet if it be in relation to the act in question, it is well settled it will invalidate contracts generally, and will defeat a will which is the direct offspring of that partial insanity, both in the courts of common law and in the ecclesiastical courts, although the testator, in making it, was sane in other respects on ordinary subjects.

This question is one which has been discussed on several occasions in the English courts, and occasioned some diversity of sentiment: but seems to be now settled in accordance with the principles I have stated. The first case was that of Mr Greenwood, which is found to have excited much attention from the peculiarity of its circumstances, and is stated by Lord Eldon in White *v.* Wilson, 13 *Ves.* 89. He was bred to the bar and acted as chairman to the quarter sessions, but becoming diseased, and receiving, in a fever, a draught from the hands of his brother, the delirium taking its ground then, connected itself with that idea, and he considered his brother as having given him a potion with a view to destroy him. He recovered in all respects, but that morbid image never departed, and that idea appeared connected with the will by which he disinherited his brother; nevertheless, it was considered so necessary to have some precise rule, that though a verdict was obtained in the common pleas against the will, the judge strongly advised the jury, in a second trial, to find the other way, and they did accordingly find in favour of the will. Further proceedings took place afterwards and concluded in a compromise. See 1 *Pow. Devises* by Jarman 130, *note (Law Lib.* 75), and *Shelford on Lunatics* 296 (*Law Lib.* 188.) Another case soon after occurred, in which a similar question arose; that of Dew *v.* Clark (*Haggard Ecc. Rep.* 18), 3 *Add.* 79–209, *Shelf. Lunat.* 297 (*Law Lib.* 189.) In this case there was evidence to show that the deceased, in the ordinary transactions of life, conducted himself and his affairs rationally—was a sensible, clever man—amassed a considerable fortune by his profession—took great care of his property—and that several of his friends and acquaintance, some of them medical persons, never considered or even suspected that he was deranged in his mind; yet it was shown that he laboured under certain delusions respecting his daughter and himself: so that, although she was proved to have always been amiable in disposition, of superior natural talents, engaging in her manners, diligent, industrious, submissive and obedient, patient under affliction, dutiful and affectionate, modest and virtuous, moral and religious: yet in the deluded mind of the deceased, she was the most extraordinary instance of depravity,

[Boyd v. Eby.]

vileness, vice, crime, profligacy, hypocrisy, artifice, disobedience, revolt and rebellion, and quite irreclaimable; while in regard to himself, he was a pattern of fatherly tenderness and affection, though tying his daughter to a bed-post and flogging her with the most unmerciful severity, and aggravating her sufferings by other acts of cruelty, and compelling her to perform the most menial drudgery and of the severest sort, to which even a servant would not submit. All these were represented by himself as proofs of his great tenderness and regard; these impressions accompanied him through life, and were recorded in his will. To remove these delusions, no reasoning, no argument, no interposition of friends, no pastoral authority was of any avail; even the sanction of religion could not convince him that his ideas were erroneous, nor induce him to alter his conduct. Sir John Nichols, after saying what might be the condition of the deceased as applied to other transactions, civil or criminal, it was not his duty to consider, but he decided that he was not a person of sound mind when he made the will; or, in Lord Coke's language, was *non compos mentis*. He therefore pronounced against the validity of the will. This was confirmed by the delegates; and the lord chancellor, on a petition for a commission of review, gave judgment that, under the circumstances of the case, he did not think fit to recommend it.

In another case, that of Fulleck *v.* Allison, 3 *Hagg. Ecc. Rep.* 527, it has been held that to set aside a paper on this ground of monomania, or partial insanity, it must be shown clearly and decisively that the belief which occasioned the act was founded upon a delusion—that is, it must appear beyond doubt that there was no ground for suspecting the facts to be as the testator thought them.

The question then will be, was the party of sound memory and discretion when he made this codicil, taking into view his previous state of mind and feelings towards these relations when of sound understanding, his former will and disposition in their favor, which must stand till legally revoked, the general insanity and prostration of understanding which ensued, the delusive belief or opinions in regard to Col. Boyd, originating in his mind during that insanity, his degree of recovery, the continuance of the delusion afterwards, as manifested by the retention of these erroneous impressions and groundless antipathies, their operation in the making of the codicil, and especially whether the causes of those impressions were true, or even if not, yet were of such a character as to warrant the impressions; or on the other hand were utterly groundless, and such as no man in his senses could entertain, and occasioned merely by insanity. If the latter were the case, then I think that, according to the principles of the law, he was not competent to make a codicil which altered his will in the manner he has done. It seems to me that the court below fell into an error in drawing a distinction between the insane delusion itself, and the impressions or prejudices occasioned by such delusion: and in supposing that the former might

[Boyd v. Eby.]

cease and the latter continue.   They are to my mind the same
thing, or rather the presence of absurd prejudices, of groundless
antipathies, of silly and chimerical hatreds, originating in acknow-
ledged insanity, is the only evidence we can have of the existence
of the delusion.   The term *delusion* refers to the state of mind:
*impression*, to the results of that state of mind; but when the re-
sults are gone, we can well assert that the delusion is gone.   In a
legal point of view, however, these subtle inquiries are useless; the
great, broad, and intelligible question is, whether the mind was
restored so as to be sound, whole, *compos;* or whether a portion
of its thinking and judging power, as connected with the subject of
the will, remained mangled and perverted at the time of making
the codicil, so as to leave it incapable of interfering with his former
disposition of his estate with judgment and discretion.

Judgment reversed, and *venire facias de novo* awarded.