## In re KAHN'S WILL.

*(Surrogate's Court, New York County.    May 23, 1889.)*

WILLS—CAPACITY TO MAKE.

During the last few years of his life decedent stated to various witnesses (friends of the family) that his children and his wife were persecuting him in various ways; that they had conspired to put him in a lunatic asylum, and had made preparations

to that end; that they caused the children in the streets to cry out at him as he passed, etc. His children and the friends of the family testified that the accusations were unfounded. When reasoned with by friends he sometimes seemed convinced that he was in error, but would repeat his charges at the next interview. He refused to eat food sent him by his daughter, alleging that it contained poison. About this time he made the will offered for probate. These suspicions finally culminated in his killing his wife, and inflicting mortal injuries on himself. *Held*, that testamentary incapacity was clearly shown.

Application for the admission to probate of a paper purporting to be the last will of Elias Kahn, deceased.

*Joseph Newberger,* for proponent. *Samuel H. Weiss* and *Julius J. Frank,* for contestants.

RANSOM, S. After hearing the arguments of counsel, and a careful reading of the proofs taken before the assistant, it is apparent that the principal and controlling issue in the proceeding is whether the decedent, in January and February, 1886, when the paper offered as the will was prepared and executed, and previously thereto, was laboring under an insane delusion in reference to the conduct and designs of his children and wife towards him. By the instrument the decedent bequeaths to the Hebrew Orphan Asylum and to the Mount Sinai Hospital, in the city of New York, $500 each; to the Congregational Shearith Israel and the Phœnix Widow and Orphan Aid Society, each $300; and to the Ansehe Buekue Cholem Society $200. To his daughter Bella Noot, he gives $10. The remainder of his estate, real and personal, is given to his executor in trust, in his discretion to pay the income to his wife, Babetta, until his oldest grandchild shall arrive at the age of 21 years, or during the term of her natural life. If she should die before such grandchild arrived at that age, he directs that the estate be divided between the children of his daughters Rosie Franklin and Sarah Gumbrecht, and his son, Henry Kahn, subject to the dower of his wife, if she be then living. It also empowers the executor to sell all real estate, or any part thereof, to carry out the terms and directions of his will, and appoints his "friend Manuel Westheimer" his executor. The decedent was of German birth, and began life in humble circumstances. He was a cigar-maker. Over 20 years before his death, he quit active effort in his trade, and lived upon his income. His four children, after leaving school, went into remunerative employments, and thenceforward the wages of each were given to the decedent until the child married, and during that period he had the benefit of their earnings, less the cost of their support, living in a frugal way. The income of the family had been invested in two pieces of real estate, in which he held the fee at his death, No. 714 Sixth street, and a half interest in No. 626 Sixth street. He died at the age of 63.

The proofs show that until about six years before his death pleasant relations had existed between the decedent and his wife and children, and that he was accustomed to speak of them in terms of praise by reason of their devotion to his interests. A change was observed in his feelings towards them about the time that his daughter Isabella, against his wishes, had become enamored of a young man named Noot, a resident of Chicago, and she, rather than forego her preference for her affianced husband, left her home, and joined him in Chicago, where they were married. In the instrument the decedent expressly states that the bequest of $10 to Mrs. Noot is to show her that "he had not forgotten her in his will, and to recall to her her disobedience at the time of her marriage." Her disinheritance under the circumstances reflects no light on the question of the decedent's mental condition. But soon thereafter he made statements to different witnesses, all intimate friends of the family, in which he represented that his children were persecuting him in various ways, and at times he stated that his wife was a party to their conduct. These statements were repeated from time to time during the remain-

der of his life.  They were, in substance, that his children were endeavoring to get his property away from him; that a son and daughter had attempted to poison him; that his children, or some of them, had declared that he ought to be in an insane asylum; that they had employed men to watch him for the purpose of taking him to an asylum; that his son had spoken with the captain of a steamer, in which he went to Europe, to have him arrested as a lunatic when he arrived at Bremen; that his children had conspired to place him in a lunatic asylum; that they had caused carriages to be employed to remove him from his house to an asylum; had threatened to have a lawsuit begun against him by the government because he had once brought from Europe a pair of earrings without paying duty thereon; and that they had caused the children in the street to cry out to him as he passed.   These statements were made by the decedent in different forms to several persons wholly disinterested.   The testimony of the children and the friends of the family prove that these accusations were without foundation in fact; but he continued to make them, more or less, from the time of the marriage of his daughter Bella until within a week or 10 days of his death.   When reasoned with by friends he sometimes seemed convinced that he was in error; but at the next interview he recurred to the subject, and repeated his charges.   On the 27th of January, Jacob Kahn, a brother of the decedent, died.   During the week following his funeral, in conformity with a custom of the Hebrews, the decedent passed the time with Mrs. Yette Kahn, the widow of his brother, at her house, and then, in conversation with her, he was especially emphatic in his assertions of the persecutions of his children, and he refused to eat food which his daughter sent him, alleging that it contained poison.   It was about this period that the instructions were given for the preparation of the instrument under consideration, which was executed a few days thereafter.

I am compelled to conclude that the belief entertained by the decedent of persecution on the part of the wife and children was a delusion proceeding from a diseased brain, and that the instrument is the offspring of the delusion.   Isaac Westheimer, the son of the proponent, and a subscribing witness, states that at the time of the execution the decedent said if his children had been to him as Mr. Westheimer's children had been to their father the will would never have been made in the manner in which it was.   To avoid a testamentary instrument capricious feeling and prejudice are not alone sufficient; the proofs must show that the instrument had its origin in a delusion of the mind unsound in respect to the subject involved.   This case is clearly such a one, and the facts proven are of themselves sufficient to justify a refusal of probate to the instrument.   But subsequent events, independent of the views of medical witnesses, remove all doubts in respect to the decedent's mental condition for years previous to his death, for late in August, 1888, a tragedy of the most startling character was revealed, in which he was the principal actor.   When his apartments were opened in the morning, the decedent and his wife were found lying in their bed, the wife dead, with a wound in her neck, evidently produced by the blade of a dull knife, which had severed the carotid artery, and the decedent himself lying naked by her side, unconscious, with his abdominal belt cut through by a lacerated wound, apparently made by the same instrument, and with evidences of ineffectual attempts at self-mutilation at other places in the abdomen; and an open knife was found in the room, which the physician who was called in after the discovery of the tragedy stated was one by which the homicide and attempted suicide could have been accomplished.   There is no proof in the case showing that the decedent had the ill will of any person, and the irresistible inference, in view of the delusion under which he had been for years laboring, is that his insanity had culminated in the killing of his wife, and his attempted self-destruction and death, which followed about nine o'clock in the evening of that day, at Bellevue Hospital.   The killing of his wife, whom he had ac-

cused of being a party to the supposed persecution of his children, the attempt on his own life by a dull knife, and the manner of using it, were a natural sequence from a belief in acts of persecution by his family, which had their origin in a diseased mind.

In the leading case in this state (*Society.* v. *Hopper,* 33 N. Y. 624,) Judge DENIO, in delivering the opinion of the court, enunciates the principle governing this class of cases in clear and forcible manner, as follows: "Setting aside cases of *dementia,* or loss of mind and intellect, the true test of insanity is mental delusion. If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act, and speak like a sensible man. If the deceased  * * * was unconsciously laboring under a delusion as thus defined, in respect to his wife and his family connections, who would naturally have been the objects of his testamentary bounty when he executed his will, or when he dictated it, and the court can see that its dispository provisions were or might have been caused or affected by the delusion, the instrument is not his will, and cannot be supported as such in a court of justice. The conduct and designs which he imputed to his wife and relations were such as, upon the assumption of their existence, should have justly excluded them from all share in the succession to his estate."

In *Boyd* v. *Eby,* 8 Watts, 66, the learned court says of a decedent whose will was under consideration: "If he is under a delusion; though there be but a partial insanity, yet, if it be in relation to the act in question, it is well settled it will invalidate contracts generally, and will defeat a will which is the direct offspring of that partial insanity." I have no reason to doubt that the will reflects the wishes of the decedent at the time of its preparation and execution, and that he alone originated its dispository provisions. It was written by an experienced lawyer, who died before the trial,—Isaac Westheimer,—one of the subscribing witnesses, and a son of the proponent, and his father, who was present at the execution, were examined as to the facts that transpired on the occasion of its execution. Both, I believe, aimed to tell the truth of what occurred, though their memories were very defective. If they had been dishonest they could have framed a story that would have admitted of no doubt in respect to the valid execution of the paper. But the presence of the attorney, who was himself a subscribing witness, together with the facts proven by the two Westheimers, satisfy me that the instrument was properly executed. But, holding as I do, that it originated in an insane delusion, probate must be denied, and a decree may be submitted accordingly.