Fairchild et al *v.* Bascomb et al.

---

B. FAIRCHILD AND LYMAN BURGESS *v.* LINUS BASCOMB AND OTHERS, *heirs of* ELIZA B. CLARK, *deceased.*

*Evidence.    Experts.    Insanity.    Will.    Guardian.    Probate Court.*

*It seems* that physicians in general practice, and nurses accustomed to attend the sick, are *experts*, in respect to the mental capacity of sick persons. ALDIS, J.

Therefore, upon the trial of the question of the insanity of a testatrix, *it seems* it would be proper to describe to such a physician or nurse the symptoms and condition of the testatrix, when the will was executed, as disclosed by testimony, and to ask the witness what measure of mental capacity such a person would, in his opinion, possess, at so short an interval before death as that which elapsed between the execution of the will and the death of the testatrix. ALDIS, J.

But *it seems* that a physician who for more than thirty years has devoted his attention almost exclusively to the treatment of insane persons, would not be an *expert* whose testimony in reply to such an inquiry would be competent, because the inquiry relates to the mental capacity of a person not previously insane, but in an enfeebled physical condition of long duration, and just about to die. ALDIS, J.

In a trial involving the question of the sanity of a person, a medical witness who has heard the testimony, may give his opinion as to such person's sanity or insanity, as indicated by any given state of facts, so long as such facts are warranted by the evidence, and are not conflicting.

But where facts on one side conflict with facts on the other, they ought not to be incorporated in one question, but the attention of the witness should

be called to their opposing tendencies, and if his skill or knowledge can furnish the explanation which harmonizes them, he is at liberty to state it.

Therefore, in a trial involving the question of the sanity of a testatrix, the testimony on the opposite sides as to her sanity being very conflicting, the following question, put to an expert on the subject of insanity, was held to be improper, as involving so many facts that the witness would be obliged, in order to answer it, to settle in his own mind other disputed facts disclosed in the testimony; in other words, to assume the province of the jury. The question was as follows: *"If the facts stated by the witnesses on the part of the defence touching the physical condition of the testatrix and her symptoms and conduct, are true, and the testimony of the witnesses on the part of the plaintiffs, relating to her conduct, is also true, what, in your opinion, was the mental condition of the testatrix in respect to sanity or insanity, at the time of the execution of the will?"*

It is not proper to inquire of a medical expert whether the person in question question possessed sufficient mental capacity to transact business, or to make a will. The question should be so framed as to require the witness to state the degree of such person's intelligence or incapacity, in the best way he can.

A witness having been examined in respect to the sanity of the testatrix, it was held competent for the other side to show, as affecting the degree of credit to be given the witness, that a year previous to the trial, the witness had a severe disease of the brain, and that it had affected his mind.

When a witness upon cross-examination is inquired of in respect to a new subject, not connected with any matter for which his evidence was offered by the party introducing him, the cross-examining party can not contradict the reply of the witness to such inquiry.

Upon the question of the validity of a will, as relating to the sanity of the testatrix, or undue influence upon her, it is competent to show that she had brothers and sisters who were poor, for whom she cherished feelings of affection, and of whose poverty she was aware, and yet made no provision for them in her will; and also that the sole legatee, her brother, was known to her to be intemperate.

*Held, also,* that it was competent to show that for four years before the execution of the will, during a great portion of every year, her conduct, habits, and conversation were strange, unnatural, and different from what they were during the previous years of her life.

The false statements of the sole legatee, as to the execution and contents of the will, *held* admissible, as having some tendency to show undue influence by him upon the testatrix.

Fairchild et al. *v.* Bascomb et al.

The testatrix, shortly before her death, made application to have her guardian removed. The justices of the peace appointed to examine into the necessity of a guardian, made their examination, but did not make their report till after the death of the testatrix. Upon the filing of their report, the probate court decreed that the guardian be discharged. *Held,* that such report and decree were void, and not admissible in evidence.

APPEAL from the decision of the probate court, disallowing an instrument presented for probate as the last will of Eliza B. Clark.

The defences set up in the plea were : *first,* That the instrument in question was not the last will of the said Eliza B. Clark ; *secondly,* insanity ; and *thirdly,* weakness of intellect, and undue influence

The cause was tried by the jury, at the April Term, 1861, PIERPOINT, J., presiding.

The instrument in question was dated November 14th, 1858, and purported to dispose of the entire estate, (amounting, as the testimony tended to show, to some $7,000 or $8,000,) of the testatrix, to her brother, John W. Bascomb, she being a widow, and leaving no issue. By the alleged will, the plaintiffs were appointed executors.

After proof by the plaintiffs of the formal execution of the instrument, the defendants offered testimony to prove that, besides the said legatee, the testatrix had at the time of the execution of the instrument several brothers, and had also several sisters ; that two of these brothers and two of the sisters were in destitute circumstances, each having several children ; that the testatrix always entertained towards her brothers and sisters last mentioned feelings of friendship and affection, and was aware of their pecuniary condition. To this testimony the plaintiffs objected, but the objection was overruled and the testimony admitted, substantially in accordance with the offer.

The defendants also offered testimony to show that for about four years previous to the death of the testatrix, her conduct, habits, and conversation were, during a great portion of the time every year, strange and unnatural, and different from what they were during the previous years of her life. This testimony was objected to by the plaintiffs as extending back to a period

too remote; but it was admitted by the court, as tending to show insanity at the time of making the will, and several witnesses testified to her conduct during such period, tending to show the testatrix's insanity.

The testimony on both sides tended to show that the testatrix was about fifty-four years old when she died; that she was a woman of feeble constitution, and that she declined gradually in physical health for many years before she died; that for four years or more previous to her death, she was afflicted with pulmonary disease, nervous derangement, and general debility; that at eight or nine o'clock on the morning of her death, she was very low physically, and much worse than she had been for some days before, and continued sinking gradually until about two o'clock in the afternoon, when she died; and that she executed the will at about fifteen minutes before twelve o'clock of the day of her death.

Dr. William H. Rockwell was present in court during the examination of the witnesses, and heard the entire testimony on both sides.

After the plaintiffs had put in their opening testimony, and the defendants had put in all their other testimony relating in any way to the mental or physical condition of the testatrix, and before the introduction of the plaintiffs' rebutting testimony, the defendants called Dr. Rockwell as a witness, and he testified that he was by education and profession a physician and surgeon; that for more than thirty years prior to that time he had devoted his attention almost exclusively to the treatment of patients suffering from mental maladies; that during the past twenty-five years he had been the superintending physician of the Vermont Asylum for the Insane at Brattleboro, and that during that time he had had under his charge, as such physician, between 3,000 and 4,000 insane patients. The defendants then inquired of this witness as follows:

"Suppose a woman to die at the age of about fifty-four years; that she had been for fifteen years before her death in slender health, and for four years before afflicted with pulmonary disease, nervous derangement, and general debility; that she should at eight or nine o'clock in the morning before her

26

death be found very low physically, and considerably worse than she had been for days before ; that she should continue worse and gradually sinking until she died at two o'clock in the afternoon ; would she, in your opinion, possess sufficient mental capacity at a quarter before twelve o'clock to transact business ?"

This question was objected to by the plaintiffs, but the objection was overruled, and the witness answered that he thought it possible that she might be capable of disposing of her property, but it would be a great exception to the general rule if she was. The answer was also objected to.

The defendants then put the following question to the witness :

"If the symptoms and indications testified to by the other witnesses in this case with reference to Mrs. Clark are proved, and if the jury are satisfied of the truth of them, was she in your opinion sane or insane during the time that these symptoms and indications took place ? and if insane, what was the nature and character of that insanity ? What state of mind did those symptoms and indications indicate ? And what would you expect would be her conduct during that time, with reference to the disposition of her property ?"

This also was objected to by the plaintiffs, but the court overruled the objection, and the witness answered, "that he should think she was insane on two subjects—viz., as to her property, and as to living or dying."

The defendants then inquired of the witness as follows :

"If she was insane during the period of time that the symptoms spoken of were occurring, what would be the probability of her recovery ?"

This question was objected to by the plaintiffs, but the objection was overruled, and the witness answered, that "the probability of recovery in cases of insanity depended considerably upon the length of time the patient has been insane. That about twenty-five per cent of those, who have been insane one year, recover. Not over ten per cent. of those, who have been insane two years, recover, and that where insanity has existed for over three years, it is a rare thing for the patient to recover."

This question was then put to the witness by the defendants : " Judging from the facts stated by the witnesses, if true, how long, in your opinion, was Mrs. Clark insane before her death ?"

The plaintiffs objected to the question, but the court allowed the witness to answer, and he replied that, " in his opinion, she was insane from the time Dr. Hathaway first visited her in August, 1854, until her death."

The defendants then inquired of the witness :

"Judging from the facts and circumstances detailed by the witnesses touching Mrs. Clark's health, symptoms and conduct, if the jury should find them to be true, what was her mental condition as to sanity or insanity at the time of the execution of the will, November 14th, 1858 ?"

The plaintiffs objected to this question, but the objection was overruled, and the witness said that he should think she was insane.

The defendants then inquired of the witness as follows :

" In the mental condition that you think Mrs. Clark was in, if the testimony is true, would her mental disease be always perceptible ?"

The plaintiffs objected to the question, but the court allowed it to be put, and the witness replied, that " it would, if she was conversed with upon the subject on which he thought her to be insane." The court, also, against the objection of the plaintiffs, allowed this witness to testify as to the character of Ray's Medical Jurisprudence of Insanity, and of                on Insanity, as books of authority on the subjects of which they treat, and the witness testified that they were works of good authority on that subject. He also, on cross-examination, testified that certain medical books which were produced and shown to him by the plaintiffs, were works of good authority on the subject of insanity. During the argument to the jury, the plaintiff's counsel read some passages from the medical books whose character they had proved by Dr. R., and the defendants' counsel also read, without objection, some passages from Ray's Medical Jurisprudence of Insanity.

The only witnesses examined on the part of the plaintiffs,

relative to Mrs. Clark's mental symptoms, or to the condition of
her mind in respect to sanity òr insanity or imbecility, were
Messrs. Adams, Johnson, Berkley, Fairchild, Hill, Lincoln,
Russell, Ranslow, Smith and Seger, and after all the other testi-
mony having any bearing on the question of the soundness or
unsoundness of her mind, on both sides of the case, had been
put in, the defendants again called Dr. Rockwell, and put to him
the following question:

"If the facts stated by the witnesses on the part of the defence
touching the physical condition of Mrs. Clark and her symptoms
and conduct are true, and the testimony of Ranslow, Adams,
Smith, Johnson, Seger, Fairchild, Hill, Berkley, Russell and
Lincoln, relating to her conduct, is also true, what, in your
opinion, was the mental condition of Mrs. Clark in respect to
sanity or insanity at the time of the execution of the will on the
14th of November, 1858 ?"

To this question the plaintiffs objected, but the court overruled
the objection, and the witness testified, that "he still thought
she was insane, and that it was impossible to reconcile her
conduct as testified to by the defendants' witnesses with the idea
of her not being insane at the date of the will."

The defendants also offered testimony tending to show that
John W. Bascomb, the legatee, was an intemperate man, and
that this was well known to Mrs. Clark. To this the plaintiffs
objected, but the objection was overruled, and testimony tending
to show the facts offered was received.

The defendants also offered to show that on the day after the
decease of Mrs. Clark, John W. Bascomb, the legatee, stated to
one of his brothers, (one of the defendants in this suit,) that
he (J. W. Bascomb) did not know that Mrs. Clark had made a
will, and that in another conversation which he had about a
week afterwards with another brother, he, J. W. Bascomb, stated
the contents of the will to be different from what they actually
were, and considerable less favorably to himself than the fact.
This testimony was objected to by the plaintiffs, but was admitted
by the court, it appearing by the plaintiffs' own showing that J.
W. Bascomb was in the house at the time the will was executed,
and knew of its execution,

Fairchild et al. *v.* Bascomb et al.

Linus Bascomb, one of the defendants, was called as a witness on the part of the defence, to show facts and circumstances bearing on the mental condition of the testatrix prior to and at the time of execution of the instrument in question, and as to his dealings with her and of his connection with her affairs, and testified accordingly. In the course of his examination, he was inquired of, if he was the person who was appointed guardian of Mrs. Clark, and in this connection the defendants produced and offered in evidence a duly certified copy of the record of said Linus' appointment as such guardian. To the introduction of this record the plaintiffs objected, but the same was admitted by the court, to explain and give character to the acts, sayings, and proceedings of the said Linus, as testified to by himself and others, relating to the testatrix and her property, (but the jury were expressly told at the time, and also in the charge, that this evidence, or the fact that a guardian had been appointed over the deceased, was not to have any weight or to be considered by them in determining the question of the testatrix' insanity, that it was not admissible for that purpose,) it having been stated by the plaintiffs' counsel in his opening statement to the jury that the said Linus had by fraud and without the knowledge of the testatrix, procured himself to be appointed guardian, and had unlawfully and improperly interfered with her property during her lifetime, and it having already been shown by the plaintiffs by parol that the said Linus had acted as her guardian, and that proceedings were instituted by her to obtain his removal.

After the examination, without objection, of one Hathaway as a witness for the defendants, the plaintiffs offered to show by one Fairchild, (one of the plaintiffs,) that a year previous to the trial Hathaway had a severe disease of the brain, and that it had affected his mind. This was objected to by the defendants and excluded.

Hector Adams, a witness introduced by the plaintiffs, having testified in chief that he drew a will for Mrs. Clark at her request in July, 1857, was inquired of on cross-examination if that will was not drawn at the request of John W. Bascomb, and if he, the witness, did not so testify in this case before the probate

court at Milton in June, 1859 ? Both these questions having
been answered in the negative, the defendants offered to show
that Adams did testify before the probate court that he drew the
will in July, 1857, at the request of J. W. Bascomb. To this
testimony the plaintiffs objected, but the same was admitted.
The plaintiffs also offered the report of the justices appointed by
the probate court upon Mrs. Clark's application for the removal
of her guardian, to inquire into the subject of such application ;
also the record of the decree of the probate court, (both made
after the death of Mrs. Clark,) discharging such guardian.
These were objected to by the defendants and excluded.

To all the above rulings of the court the plaintiffs excepted.
No exceptions were taken to the charge of the court.

*H. B. Smith* and *George F. Edmunds,* for the plaintiffs.

*J. French* and *E. R. Hard,* for the defendants.

ALDIS, J. The more important points, raised upon the argu-
ment, were as to the questions put to Dr. Rockwell as a profes-
sional witness in regard to the insanity of the testatrix.

There is no question but that in this case the opinion of an
expert was admissible upon the question of insanity ; and that
such a witness might testify as to the nature and symptoms of
insanity and monomania ; and as to the facts proved by other
witnesses tending to show insanity, whether they, if true, did or
did not indicate partial or total insanity,—whether they indicated
a state of continuous insanity, or one with lucid intervals
occurring ;—and whether the facts proved by other witnesses
tending to show the deceased to have been sane during the same
period, were reconcilable with the idea of insanity, and might
have existed as proven, and yet the party exhibiting such appa-
rent manifestations of sanity have at the time been insane. It
is precisely in regard to such matters that the skill of an expert
is needed. So too it is not questioned that the witness might
and ought to have stated the grounds of his opinion,—for the
value of such opinions depends greatly upon the good sense and
accuracy of the reasons given for them.

Neither is it claimed that the expert had the right to give any opinion upon the evidence—or as to the preponderance of evidence—or whether the facts submitted to him for his opinion were or were not true.

Neither, we think, can it now be questioned that hypothetical questions may be put to such a witness, when the hypothesis supposes a state of facts proved, or which may be fairly claimed to be proved by the evidence of other witnesses. Such has been the practice in this State. It is the practice in other States and in England ; and it is a matter of convenience and often of necessity. But the plaintiff objected to the first and last questions put to Dr. Rockwell, upon several grounds which we will now consider.

I. It is claimed that the subject, to which the first question pointed, is not a matter of professional science and skill,—that it is one upon which the opinion of an unprofessional person is just as good as that of a physician ;—that it was not an inquiry as to symptoms indicating insanity, but as to the effect of pulmonary disease, nervous derangement and general debility upon the mental capacity of a person of sound mind.

On the part of the defendants it is claimed that the facts stated in the question related directly to the insanity of the person.

The question does not present the case of an insane person, but of one who has been sick with " pulmonary disease, nervous derangement and general debility." The phrase " nervous derangement" is claimed as indicating insanity. It attends insanity, but often exists where persons are of sound mind. The words, as used in the question and interpreted by the context, preclude the idea that that nervous derangement was meant which amounts to insanity.

The question therefore only supposes the case of a sick woman of *sound mind*, who for four years had been sick with pulmonary disease, nervous derangement and general debility, who on a given day is very low, grows worse, gradually sinks and dies at 2 P. M. ; and, upon this state of facts, inquires whether at two hours before death she would possess sufficient mental capacity to transact business. The question is not whether the disease would produce derangement of the mind at two hours before

death ; but whether by the progress of that disease as indicated by the symptoms stated, her mental capacity would become so impaired or enfeebled that she would not have mind enough left to transact common business.

Persons who are much accustomed to attend upon the sick— to watch the progress of diseases to their end and to be with the dying, are by their experience enabled to form a better judgment as to the course of disease and its probable effect upon the body and mind in the last hours of life than others who have no such opportunity. Physicians who are in general practice and nurses thus become experts in such matters, so far as experience and observation can furnish knowledge. In some diseases there is a much greater uniformity in their effect upon the mind and in the symptoms which immediately precede death, than in others. Thus in apoplexy, inflammation of the brain and other acute diseases directly affecting that organ, the physician would expect disturbance or destruction of the mental powers throughout the sickness and without intermission up to the time of death. In others, as in some fevers, the mind might wander throughout the violence of the fever, but upon its abatement and for a short time before death be restored to clearness and strength. Doubtless in by far the greatest number of maladies the mind is usually but little if at all affected by disease, and the most skilful physician is wholly unable to tell beforehand how long the sick man will retain his faculties and whether he will or will not have his reason to the last. But it can not be questioned after all that large experience and observation in such matters enable one to judge better than ordinary observers as to the indications of specified symptoms and the probable progress and effect of diseases upon the mind, and to determine what diseases and what symptoms indicate such effects, and what do not.

We think therefore that whether ", pulmonary disease, nervous derangement and general debility" would, in the progress of the disease as indicated by the facts stated in the question impair the mental powers at two hours before death, is a matter upon which the opinion of a physician, accustomed to attend such cases to their termination, might properly be admitted in evidence. Few persons without the aid of the knowledge derived from phy-

sicians and nurses would be able to form an opinion on the subject. In most cases, however, there is so little uniformity in the effects of diseases upon the mind just before death that the mere opinion of a physician as to the matter would obviously be evidence greatly inferior in value to the actual observation of an intelligent bystander.

It is further objected that the witness was an expert only upon the subject of insanity, and that this was an inquiry as to a disease as to which it was not shown that Dr. Rockwell had the skill and knowledge which would make him an expert. It is plain that the professional witness can be allowed to give his opinion only upon those very matters in which he is shown to have special knowledge and skill. As to all other matters he stands in the position of ordinary witnesses, who are not allowed to give their opinion upon facts proved by other evidence.

*The People* v. *Rector*, 19 Wend. 576; C. J. Tindal in *Ramadge* v. *Ryan*, 9 Bing. 333; *Rambler* v. *Tryon*, 7 Serg. & R. 90; *Dunham's Appeal*, 27 Conn. 192; *Heald* v. *Thing*, 45 Maine 392.

It appears from the case that Dr. Rockwell was by education and profession a physician and surgeon, and that for more than thirty years he had devoted his attention almost exclusively to the treatment of patients suffering from mental maladies.

When a physician thus devotes himself to a specialty in his profession, it is obvious that his skill and knowledge in those departments of his profession which he does not practice, must be much less than those of physicians who do study and practice in them, and be of but little value as a guide to unprofessional persons. Especially is this to be considered, when as in this case, the inquiry is as to the effect of disease in its last stages in impairing the mental powers of persons of sound mind, when it would seem that the witness could have had little or no experience or practice in ordinary diseases affecting such persons; and no evidence appears to have been given that he in fact had ever treated the disease in question, or observed its effects in its last stages upon persons of sound mind. The mere fact that a person was by education a physician, if he had not practised his profession, we should not deem sufficient to justify his admission as an ex-

pert. So if he devoted himself exclusively to one branch of his profession and had had no practical experience in that subject matter to which he was called to testify—as if an oculist was called to testify about insanity—we should not deem him admissible. We feel that such considerations have much force in regard to this inquiry put to Dr. Rockwell, and the effect of his answer to it upon this case. As the case must be opened upon other grounds we do not pass upon this point.

II. It is said that the facts assumed to be true in the last question put to Dr. R. could not all be true:—that the evidence was conflicting. We have examined such minutes of the testimony as have been furnished us, though they are not the Judge's minutes and are imperfect.

The plaintiff's testimony tends to show that Mrs. Clark was sane, had correct ideas as to the amount and disposition of her property, and this up to the time she made her will.

The defendant's testimony tends to show she was insane, and especially in regard to her property. But none of the plaintiff's witnesses were present upon the occasions testified to by the witnesses for the defence—nor were any of the defendant's witnesses present upon the occasion, testified to by the plaintiff's witnesses. It is possible therefore that all the facts to which they testified on both sides may have been true; although it is somewhat difficult to believe that the same woman, at periods of time near to each other, when talking upon the same subject,— her property,—and that the subject on which she is alleged to have been insane, should have talked to one set of witnesses rationally and to the other wildly and insanely. It is possible that she might have been insane, and yet while talking with the plaintiffs' witnesses have appeared sane, or sane, and have appeared insane to the defendants' witnesses. Hence the hypothesis of the question may be true. But if all the facts so testified to on both sides are true, then the opinion that Mrs. Clark was insane must rest upon the ground that the *indicia* of sanity were consistent and reconcilable with her being insane at the very time. It was proper for the witness to give his opinion on this point; to state from his knowledge how deranged persons assume the appearance of sanity even when talking upon the

subject upon which they are insane ; and from what motives or causes, and to what extent and under what circumstances, they will so appear, and how likely this is to happen. He might point out why the manifestations of sanity might not be conclusive as to her being sane, and how and why such appearances might be reconcilable with her insanity.

It is claimed that the question went further and demanded of him an opinion upon the whole case equivalent to the finding of a verdict by the jury.

The question supposed that the whole evidence bearing upon the issue of insanity on both sides was true, and, upon the whole case thus summed up, asked him to give his opinion as to her mental condition. It is obvious that this is all that a jury could do, upon that basis. It is saying not only that the facts tending to show her sane *may* be accounted for and reconciled with the idea of her being insane, but that they are reasonably to be so accounted for. The answer of the witness shows this : " I think her insane, for it is impossible to reconcile her conduct as testified to by defendants' witnesses with the idea of her not being insane at the time of the will ;" that is, that the evidence to show her insane is so strong that he considers it conclusive on the point—preponderates decidedly over the evidence to show her sane ; and that the proofs for the plaintiffs' must be accounted for as consistent with her insanity, as the other evidence can not be reconciled with her sanity. It seems to us to be really asking the witness for his opinion as to the preponderance of the evidence. A recurrence to the evidence seems to us to make this obvious. The plaintiffs' evidence tended to show that but a short time before her death she retained counsel and instituted proceedings to remove Linus Bascomb from the guardianship which she claimed he had got by fraud. In these consultations with her counsel and in her examination at the inquest as a witness upon the subject of her property and her relations to her brothers in regard to it—points upon which she is claimed to have been insane, she is said to have testified correctly and rationally and to have shown no signs of insanity, and to have so continued sane to the time of her will and her death. The defendants evidence was that her condition at the inquest was fair, but that

John W. Bascomb stood near her when testifying and shook his head at her and expressed his feelings in other ways. It is obvious that the defendants would claim as a fair inference from this evidence that John W. Bascomb's influence upon her at the inquest, and in regard to the litigation, made her appear sane at and about that time; and thus these different appearances of Mrs. Clark could be reconciled, and yet she be insane. But this would of course be contested by the plaintiffs. Now Dr. Rockwell's answer to the question goes upon the hypothesis that the appearances of sanity were true and yet reconcilable with insanity. How reconcilable? He does not say. But it seems to us that the witness in order to so reconcile them, must have determined in his own mind that she was influenced to assume a sane appearance by John W. Bascomb from the motive to thereby prevail in the litigation with Linus. And thus the question involved the necessity of the witness finding a controverted fact in order to reconcile conflicting evidence and give his professional opinion. This was not permissible to the witness, it was only for the jury.

Upon the question, whether a medical witness called to hear the testimony and to testify, may give his opinion, upon the facts testified to by other witnesses, as to the insanity of the party, the authorities do not seem to be agreed.

In *The Commonwealth* v. *Rogers*, 7 Met. 500, SHAW, CH. J., seems to consider such an opinion admissible ; yet this decision is accompanied with the caution that the witness is not to judge of the truth of the facts testified to by others.

In *The People* v. *Lake*, 12 N. Y. 358, HAND, J., suggests that the witness ought not to give such general opinion upon the case. He says, " Before the questions upon matters of science can arise, the witness must determine in his own mind upon the truth of the evidence which he has heard ; which is not a matter of science but of fact for the jury. But he may be asked whether such and such appearances were symptoms of insanity, and whether such a fact, if it exist, is or is not an indication of insanity. Upon principle it may be doubted whether, strictly, medical witnesses should ever give an opinion upon the general question of the sanity or insanity of a prisoner, as that is a ques-

tion for the jury." The decision of that case did not turn upon that point ; and it may be observed that the authorities cited do not seem fully to sustain the opinion expressed. In *Norman* v. *Wells*, 17 Wend. 161, Judge Cowan remarks, " I know that in questions of insanity some courts allow witnesses to throw in their opinions from what they have seen and heard. But I always found that such cases were much better tried where opinions were kept entirely out of view ; and I have generally excluded them *except where they came from professional men*." He cites from *Folks* v. *Chad*, 3 Doug. 157, the language of Lord Mansfield that the opinions of scientific men, deduced from facts which are not disputed, are admissible. In *Mayor of N. Y.* v. *Pentz*, 24 Wend. 672, Senator Verplanck in a very admirable opinion recognizes the admissibility of such evidence, upon the ground that " scientific opinion is in fact testimony to a law of nature."

In Massachusetts the earlier decisions do not disagree with the opinion of SHAW, CH. J., in Rogers' case.

In *Hathorn* v. *King*, 8 Mass. 371, the facts were in some respects like the case at bar. The scrivener was called in at 11 A. M. The testatrix was then very low, continued sinking till 6 P. M., when she made the will, and died at a quarter past 8 o'clock in the evening. The opinion of her attending physicians as to the soundness of her mind, founded upon circumstances and symptoms they observed, were held admissible. No other question was presented by the case.

In *Dickinson* v. *Barber*, 9 Mass. 227, the depositions of medical men stating opinions but *no facts* were rejected. The Court observed that " the opinions of professional gentlemen are not to be received as evidence unless predicated upon facts testified either by them or by others."

The case of *Davis* v. *Mason*, 4 Pick. 156, may be referred to as illustrating the ground upon which the opinions of experts upon the point at issue are admitted. The question was whether certain heaps of stones and marked trees were monuments of boundaries. A skilful surveyor testified to their appearance. He was then asked his opinion whether they were or were not boundaries. This was objected to as matter solely for the jury.

The Court held the opinion competent evidence, because by long experience he had acquired skill in determining the question submitted to him. The witness might have told how heaps of stones and marked trees, designed as monuments of boundaries, usually appear and then have described the appearance of these, and then have stopped without giving his opinion. But the opinion of a skilful person, founded upon facts seen by himself, often embodies the result of facts and observations which it is difficult to describe, and which can in no way be so satisfactorily and naturally expressed as by giving his opinion. But when the facts are stated by another, there seems to be less reason and necessity for stating opinion merely; as all the facts stated to the witness can be by him stated singly or together, with the effect which they ought to have, as proofs, upon the issue.

In *The U. S.* v. *McGlue*, 1 Curtis, C. C. R. 1, physicians were not allowed to give their opinions upon the case, but only upon known or hypothetical states of fact warranted by the evidence; because, says the learned judge, " the case, on which any one might give his opinion, might not be the case which the jury, upon the evidence, would find.

In *Spear* v. *Richardson*, 37 N. H. 24, the court hold that the true rule and uniform practice in New Hampshire is that the expert may not give his opinion upon the case, as shown upon the proof; but may upon a state of facts, such as the evidence tends to establish, hypothetically stated.

In *Buffum* v. *Harris*, 5 R. I. 243, the experts gave their opinions upon the point at issue, but founded upon their own knowledge of facts and upon facts stated by others. The question was as to the percolation of water through the soil from a spring—the experts knowing the soil and having knowledge as to the percolation of water through different soils, and assuming other material facts hypothetically.

In England the following authorities bear upon the question. *Rex* v. *Wright*, 1 Russ. & Ryan, 466, is a Crown case reserved for the consideration of the twelve judges, in which " several of the judges doubted whether the witness could be asked his opinion on the very point which the jury were to decide, viz: whether from the other testimony given in the case the act was

Fairchild et al. *v.* Bascomb et al.

in his opinion an act of insanity." Such a question, in that case, was just equivalent to asking the opinion of the witness upon the testimony as to the mental condition of the prisoner.

In *Gills* v. *Brown*, 9 Carr. & Payne, a case of collision upon the Thames, a sea captain was not allowed to say whether the conduct of the captain of the brig was right; but his opinion was obtained by asking him what was the duty of a captain under certain specified circumstances.

In *Malton* v. *Nesbit*, 1 Carr. & Payne 70, case for negligence in managing a vessel—the plaintiff's counsel wished to ask the witness, whether, supposing the facts proved to have occurred, they showed negligence in the captain. Scarlett objected. ABBOTT, CH. J., held that the plaintiff's counsel might state to the witness what had been done, and might ask him if an officer of competent skill would have done so.

In *Fenwich* v. *Bell*, 1 C. & K. 312, a case of collision, this question was allowed: "whether, if the facts proved by the plaintiff be true, he was of opinion that a collision could have been avoided by proper care on the part of the defendants."

In *Jameson* v. *Drinkald*, 12 Moore 157, the witness may state to what cause the accident is attributable, but not whether the fault was on one side or the other.

In this state, in *Lester* v. *Pittsford*, 7 Vt. 158, Judge PHELPS says, where mere opinion is required upon a given state of facts, that opinion is to be derived from professional men.

In *Morse* v. *Crawford*, 17 Vt. 500, it is held as well settled in this state that a witness not a professional man, may give his opinion touching the insanity of a party, when it is founded upon facts within his own knowledge.

In Greenleaf on Evidence § 440, the author thus sums up the present state of the law on this subject: "The opinions of medical men are constantly admitted as to the sane or insane state of a person's mind, as collected from a number of circumstances, though founded not on personal observation, but on the case itself, as proved by other witnesses on the trial. They can not give their opinions as to the general merits of the cause, but only upon the facts proved. And if the facts are doubtful, and remain to be found by the jury, it has been held improper to ask

an expert, who has heard the evidence, what is his opinion upon the case on trial ; though he may be asked his opinion upon a similar case, hypothetically stated."

A study of the various cases will show that the form of the question is modified and shaped by the courts; whether it states facts, or puts facts hypothetically, or refers to the testimony of witnesses as being true ; so as to give the witness no occasion or opportunity to decide upon the evidence, or mingle his own opinion of the facts, as shown by the evidence, with the facts upon which he is to express a professional opinion. This is the important point, and to secure this, various forms of inquiry have been adopted. Hypothetical questions may be so put as to require the witness to decide upon the evidence, to determine which side preponderates, and to find conclusions from the evidence, in order to reconcile conflicting facts. Such questions, though hypothetical, are as clearly improper, as if they directly sought the opinion of the witness on the merits of the case. Hence, in framing such questions, care should be taken not to involve so much, or so many facts in them, that the witness will be obliged in his own mind to settle other disputed facts in order to give his answer. Such, as we have already intimated, was the error of the last question put to Dr. Rockwell.

We have no doubt that a medical witness who has heard the testimony, may give his opinion, as to the sanity or insanity of a party, as indicated by any given state of facts, so long as such facts are warranted by the evidence, and are not conflicting. In some cases all the facts bearing on the issue might be summed up in a single question. But when facts on one side conflict with facts on the other, they ought not to be incorporated in one question, but the attention of the witness should be called to their opposing tendencies, and if his skill or knowledge can furnish the explanation which harmonizes them, he is at liberty to state it. Then the jury can know all the facts and grounds on which the opinion is based.

III. What is sufficient capacity to transact business, or to make a will, is a matter of law, depending somewhat upon the nature of the business. A witness may not correctly apprehend the rule of law, and if he uses such expressions may be misled

himself, or may mislead the jury. Hence the question should be framed so as to require him to state the measure of the testator's capacity in his own language, and by such ordinary terms or forms of expression as will best convey his own ideas of the matter ; or, to use Judge Ruffin's expression in *Crowell* v. *Kirk*, 3 Dev. 358, to state the degree of intelligence or imbecility " in the best way he can.".

IV. We think the evidence to show that Hathaway's mind was still affected by a severe disease of the brain he had had a year previous, was admissible, as tending to show that his memory and his judgment, (both of which were in question,) were less to be relied upon than if he possessed full mental health and vigor. It was admissible, as affecting the degree of credit to be given to him.

V. The question put to Hector Adams, whether he did not draw Mrs. Clark's will in 1857 at the request of John Bascomb, was an inquiry not connected with any matter for which his evidence was introduced by the plaintiff. It was a new subject of inquiry, for the benefit of the defendants, and upon which Adams became their witness, and his evidence on that point could not be impeached by them. Hence the testimony as to his declarations before the probate court should have been rejected.

VI. That the testatrix had brothers and sisters who were poor, for whom she cherished feelings of affection, and of whose poverty she was aware, were important elements in considering what would be the natural and reasonable disposition of her property by will, and the evidence to show these facts was properly admitted.

So the evidence to show that her brother, the legatee in the will, was intemperate, and this well known to the testatrix, was admissible, as tending to show that a bequest of all her property to him was not an act to have been naturally expected of her.

VII. Testimony to show that, for four years before her death, during a great portion of every year her conduct, habits, and conversation were strange, unnatural, and different from what

27

they were during the previous years of her life, tended to show her insane continuously, and up to the time of her death.

VIII. The false statements of John W. Bascomb as to the execution and contents of the will—he being the sole legatee—were properly admitted. They impress the mind with the idea that he professed ignorance as to the will, to shield himself from the suspicion of having used undue influence to procure it. Why should he do this, if there was nothing to conceal?

IX. The report of the justices, and the decree of the probate court, were both made after the death of Mrs. Clark. The inquest was had upon her application. By her death there was no prosecuting party in court, and the proceedings and the guardianship were at an end. The guardian was not bound to resist the acceptance of the report, or the making of the decree. What would have been the final report and decree if she had lived—what objections would have been made, and might have prevailed, as to the report, we can not now tell, for before her death the proceedings had not been perfected, and after her death they could not be. We think the making of the report and the decree after her death must be deemed void and of no effect against the defendants, and their exclusion as evidence was right. In the authorities cited we find none which sustain a report or decree similar to these.

Judgment of the county court reversed, and case remanded for a new trial.