STATE v. MED. JOURNEGAN.

(Filed 11 April, 1923.)

1. Evidence—Corroboration—Statements Made by Witness to Others—Criminal Law.

　　A witness may corroborate his testimony by testifying that he had made the same statement to other parties, and a defendant in this action for illicit manufacturing of liquor was properly permitted to testify as to the identity of two others who were with him engaged therein, but escaped

the officers making the arrest, and then to state that he had told the officers making the arrest that they were present and engaged in the unlawful act.

2. **Intoxicating Liquors—Spirituous Liquors—Criminal Law—Evidence— Mental Incapacity—Criminal Intent.**

When the defendant is being tried for illicit distilling of whiskey, it may be shown in defense that he was mentally incapacitated from distinguishing between good and evil and could not appreciate the illegal consequences of his act because of mental incapacity; but testimony by a nonexpert, and from his personal observation, to the effect that the defendant did not have mental capacity to operate a still is incompetent and properly excluded. The charge in this case is approved.

WALKER, J., concurring.

APPEAL by defendant from *Cranmer, J.,* at January Term, 1923, of FRANKLIN.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*
*William H. & Thomas W. Ruffin and W. M. Person for defendant.*

CLARK, C. J. The defendant, a white man, and two negroes were found by the officers at a copper still actively engaged in the manufacture of whiskey. They had two barrels of beer, some jugs, a bushel of meal in a bag, and two empty barrels. One of the negroes, Percy Mitchell, on being examined for the State, testified that he, Harry Alston, and the defendant Journegan were at the still at the time the officers came up. They ran before the officers reached them, but Percy Mitchell was caught while running off by Mr. Fuller, one of the officers, and he was permitted to testify that he told Fuller who were present at the still, and to state that the defendant Journegan and Harry Alston were the men. The defendant excepted, but it is settled by this Court that a witness can corroborate himself by testifying that he had made the same statement to other parties. *S. v. Maultsby,* 130 N. C., 664.

The defendant relies, however, upon exceptions to the refusal of the court to permit answer to the following questions by one Thompson, witness for the defendant: "In your opinion, do you think that he (Journegan) has sense enough to operate a blockade still?" and, also, "Do you think, on 12 December, 1922, Journegan had sufficient mental capacity to operate a still, and to know it was wrong to run it?" The answers to these questions were excluded, and it does not appear what they would have been. The real inquiry is not his capacity to run a blockade still, but did he aid in doing so, and did he know it was wrong.

While an ordinary witness, who has peculiar opportunities to observe, may express an opinion upon the sanity or insanity of a person charged with a crime, or in other cases where such sanity or insanity is an issue,

yet this expression of opinion goes only so far as to permit the witness to testify that in his opinion the defendant was insane or sane, but not whether he was guilty of this particular offense because of lack of mental capacity.

Whether or not Journegan had sense enough to operate a blockade still was not for the witness to determine. The evidence is that Journegan, a white man, was in fact operating the still and supervising two negroes who were aiding him.

In *S. v. Haywood,* 61 N. C., 376, *Pearson, C. J.,* approved the following introduction by the judge as to the test of insanity in criminal cases: "If the prisoner at the time he committed the homicide was in a state to comprehend his relations to other persons, the nature of the act in its criminal character; or, in other words, if he was conscious of doing wrong at the time he committed the homicide, he is responsible. But if, on the contrary, the prisoner was under the visitation of God and could not distinguish between good and evil, and did not know what he did, he is not guilty of any offense against the law; for guilt arises from the mind and wicked will." This definition has always been sustained and followed in this State. In that case, *Chief Justice Pearson* said: "We fully approve of the charge of his Honor upon the subject of insanity. It is clear, concise, and accurate; and as it is difficult to convey to the minds of juries an exact legal idea of the subject, we feel at liberty to call the attention of the other judges to this charge." This case has been repeatedly cited with approval since.

The judge charged the jury: "Now as to the plea of insanity. I have instructed you, and repeat my instruction, that there is no burden upon the State. It is presumed that all persons are sane, and he who pleads insanity must prove it to the satisfaction of the jury. You will remember the evidence of the defendant, the burden being upon him, and give it such weight as you may find it is entitled to, and the other witnesses such credibility as you may find them entitled to receive."

The judge further charged the jury: "The first thing to which you will address yourself will be the question of the sanity of the defendant at bar, and you will remember the law which I have given you, and if you find at the time that the alleged act was committed, if you find beyond a reasonable doubt that he committed either of the acts charged in the bill, he was conscious of doing a wrong, then he would be guilty, but if he was under a visitation of God, and could not distinguish between good and evil, and did not know what he did, he would not be guilty." To this charge there was no exception.

It would lead to strange results if the precedent were set in this case that a witness could testify whether in his opinion a man who committed forgery had "sufficient mental capacity to do this and understand

that it was wrong"; or whether a man guilty of homicide by the use of a deadly weapon had "mental capacity to use a deadly weapon, and to know it was wrong to kill." Larceny is defined to be the felonious taking and carrying away of the goods of another with the intent to appropriate them to one's own use. On this charge it would be competent to prove these facts, and in defense the defendant could show that he did not know right from wrong, and therefore could not have the intent. But it would be without precedent to ask if a defendant had mental·capacity to commit larceny.

Such a course of examination is without precedent, and if competent in this case where the man was found in actual perpetration of the crime and supervising the work, such inquiries would be without restriction and instances may be readily imagined which would lead to very curious results.

The defendant himself was put upon the stand and his examination shows no lack of mental capacity. He testified that he only dropped in accidentally and had nothing to do with operating the still. The testimony of his two associates, the colored men, being to the contrary, the jury did not believe him. There was ample testimony upon the question as to his mental capacity. The testimony was that he was 43 years of age, owned a large house and a farm of 34 acres, and rented out his lands. He had no guardian and collected his own rents. There was direct evidence from numerous witnesses that his mental condition was fairly good, and that in the opinion of witnesses he knew right from wrong. W. W. Green, one of the witnesses for the defendant, testified: "I consider him far removed from an imbecile. I believe if any one told him he would be punished for doing a thing he would·know that, but I do not think he has any conscientious scruples, only from being caught." This description would probably apply to many men guilty of crime.

E. M. Newman testified that he "had been living within a half mile of the defendant for 22 years. His mental condition was fairly good. In my judgment he has mental capacity to know right from wrong. As to his general character and reputation, he is just an ordinary character, nothing so extra bad and nothing so good. Some good and some bad." There were several other witnesses for the State who testified to the same purport.

Both the negroes testified that the defendant was there when they were caught, and had lighted the fire under the copper still and pushed the fire up when the still was boiling, and he knew enough about right and wrong to run when the officers came. Whether these facts made him guilty was a matter for the jury, and did not rest in the suppressed opinion of the witness whatever it might have been, whether he "had sense enough to run a blockade still."

What is the art and mystery of "running a blockade still," and what is the standard of efficiency which is necessary to make the operator liable? There is no institution, so far as we know, that issues a certificate that the holder is "capable of running a blockade still." Does it mean that the defendant must have capacity to run a blockade still successfully and profitably, and without being caught—and that if he fails in the latter respect he is not guilty? "If so, *leg*-ality is an essential element of such capacity." . The defendant did his best. He outran the officers.

The question was properly ruled out, for it was not necessary to show that the defendant had "capacity to run a still," but did he aid in doing this illegal act.

For ages the test has been in trials for all crimes, Did the defendant do, or take part in doing, the illegal act and have the mental capacity to know he was doing wrong? Both these questions were fully and cor-rectly presented in this case both on the evidence and in the charge, and the jury found against the defendant.

Before a witness can testify as to general character or the mental capacity of another, he must qualify himself as to his means of observa-tion. Even then he can testify only as to general character or mental capacity.

There is no precedent in the books to ask as to the mental capacity to commit any particular crime. Why should it be created as to "illicit distilling of spirituous liquor," especially when the witness does not testify of his own knowledge of the subject, or his observation of the defendant in exercising that particular art or committing that particular crime?

No appeal presents the question of the liability of the two negroes, but the defendant, a white man, a landowner, renting out land and collecting his rents, without a guardian, seeks to evade liability for taking part in the event by asking witnesses whether the defendant had "mental capacity to run a blockade still"—which might exculpate most, if not all, men who are caught at it.

Whether the defendant committed the act charged, and whether he knew right from wrong as defined by the court, was duly submitted on the evidence and in the charge, and found by the jury adversely to the defendant; but there is no precedent as to what is necessary to constitute "mental capacity to run a still." Does it include knowledge of the method needed to elude the officers, to make a good article, to be wary in selling it, fleetness in getting away when the officers pounce upon him, and possibly other qualifications? There being no precedents as to this, it ought not to be charged as error to the judge that he excluded such

question and submitted only inquiry according to the settled form as to the acts constituting the crime and sufficiency of knowledge in the defendant to know that he was doing wrong.

No error.

WALKER, J., concurring: I agree with the opinion and conclusion of the Court in this case, for the same reason and partly upon the same ground that I refused my assent to the opinion in the case of *In re Peterson,* 136 N. C., 13, at page 28, though for reasons there stated I concurred in the result, a new trial having been awarded.

It is not competent for a witness, especially a nonexpert, to give his opinion, for instance, as to whether a testator or a grantor in a deed had or had not sufficient mental capacity to execute the particular instrument in question, and much less is it competent for him to state whether a defendant had sufficient mental capacity to run, or operate, a whiskey or brandy still. I stated fully the reason for the opinion I then held, when the Peterson case was decided (1904), and have entertained ever since (being more convinced, after greater consideration of it since that time, that it is clearly right). I appeal to the highest authority, one of the greatest, if not the greatest, judge who ever sat upon this bench, and I disparage none in so saying. The very question was raised in *Crowell v. Kirk,* 14 N. C., 356. At that time this bench was composed of Leonard Henderson, Thomas Ruffin, and Joseph J. Daniel. *Judge Ruffin,* in his opinion, said: "As far as we perceive any meaning, we suppose the attempt was to get the opinion of the witness, whether the supposed testator had capacity *to make a will.* It could not be, whether he thought him in possession of ordinary faculties, when he executed the instrument; because the witness did not profess to have been present; and because he had just said that when sober he had his proper mind and senses. If this was the purpose of the inquiry, it was properly refused; for the witness is not to decide what constitutes mental capacity, or a disposing mind and memory; that being a matter of legal definition. He might state the degree of intelligence or imbecility in the best way he could, so as to impart to the court and jury the knowledge of his meaning, that they might ascertain what was the state of the testator's mind and memory; but whether that was adequate to the disposition of his property by will did not rest in the opinion of the witness." That is the question we have here, although the latter is far less competent than was the question in the *Crowell case, supra.* In Lawson on Expert and Op. Evidence (2 ed.), 155, it is said: "Capacity to make a will is not a simple question of fact. It is a conclusion which the law draws from certain facts as premises. Hence, it is improper to ask and obtain the opinion of even a physician as to the capacity of any one to make a

will. Under our system that question was addressed to the jury. All evidence which tended to shed light on his mental status, the clearness and soundness of his intellectual powers, should have gone before them. This being done, however, the witness should not have been made to invade the province of the jury." And the same was also stated in the following authorities: *Walker v. Walker,* 34 Ala., 470; *In re Arnold,* 14 Hun., 525; *Reg. v. Richards,* Fos. & Fin., 87, and *Fairchild v. Bascom,* 35 Vt., 416, citing *Crowell v. Kirk,* 14 N. C., 356. But the opinion of the Court, as delivered by *Judge Daniel,* in *Crowell v. Kirk, supra,* is conclusive upon the incompetency of such a question. He said: "The defendant's counsel asked his own witness, Harris, if in his opinion the testator was capable of making a will; an objection being made, the witness was not permitted to answer the question. I do not think that the judge erred in this. The opinions of witnesses in England are confined to persons of science, art, or skill in some particular branch of business, and they have to give the reasons upon which their opinions are founded. All other witnesses are to state the facts, and the jury make up their opinions on the facts thus deposed to. In this country the courts have said that the law placed the subscribing witness about the testator to ascertain and judge of his capacity. But no case has gone the length of permitting the evidence of opinion offered in this case to go to the jury." The case last cited, it seems, is directly in point and explains what is said in *Clary v. Clary,* 24 N. C., 78, so as to reconcile that case with the authorities. What was stated by *Judge Gaston* in *Clary v. Clary, supra,* is fully explained by *Judge Daniel* (for the entire Court) in the *Crowell case, supra,* where it is said, at least substantially, that *Judge Gaston's* language must be considered in relation to the particular question asked the witness in that case, and had reference to mental condition or soundness, and not to mental capacity, which is quite a different thing.

The error in *Whitaker v. Hamilton,* 126 N. C., 465, and which has crept into some other expressions in our decisions, rests entirely upon what was supposed to have been said in *Clary v. Clary, supra,* and one or two cases in which the Court seems to have clearly misunderstood the scope of that decision, as fixed by *Judge Ruffin,* the elder, *Judge Daniel,* and *Judge Gaston,* and by other judges who have followed them. *Smith v. Smith,* 117 N. C., 326; *McDougald v. McLean,* 60 N. C., 120. And in Rogers on Expert Testimony (2 ed.), p. 164, sec. 69, it is said that the "weight of authority is opposed to allowing the witness to express an opinion as to whether an individual had the mental capacity to dispose of his property by will or deed."

There is a wide difference between mental condition or soundness and mental capacity, and if this difference is carefully regarded, most of the

cases in our Reports can easily be harmonized. *Crowell v. Kirk,* 14 N. C., 356; *Clary v. Clary, supra; Smith v. Smith,* 117 N. C., 326; Lawson on Exp. and Op. Ev. (2 ed.), p. 155; *Fairchild v. Bascom,* 35 Vt., 416; Reg. Richards, Fos. and Fin., 87; *Walker v. Walker,* 34 Ala., 470; *In re Arnold,* 14 Hun., 525. The case of *Whitaker v. Hamilton,* 126 N. C., 465, was, in my opinion, erroneously decided, and should be overruled. A witness is no more competent to express an opinion as to the mental capacity of a testator to make his will than he would be to state that an act was negligently done, both involving questions of law. The latter kind of testimony this Court has steadily and consistently held to be incompetent. *Tillett v. R. R.,* 118 N. C., 1031. Nor can he state that another has acted bona fide, or without fraud. *Wolf v. Arthur,* 112 N. C., 691. In *Tillett v. R. R., supra,* at p. 1042, *Justice Avery* said: "When, therefore, the witness was asked to state whether a car was coupled in a negligent manner, the question was calculated to elicit an opinion upon one of the questions which the jury were impaneled to decide, and the objection to its competency, being made in apt time, was properly sustained." *Smith v. Smith, supra.* Mental state may be proved by a witness's opinion, as in *McRae v. Malloy,* 93 N. C., 154, cited in the opinion of the Court. See, also, *Sherrill v. Tel. Co.,* 117 N. C., 353. It is also competent for a witness to give his opinion as to whether a person is a negro or not (*Hopkins v. Bowers,* 111 N. C., 175), or that his appearance indicates the presence of negro blood in his veins, as in *Gilliland v. Board of Education,* 141 N. C., 482. But in all the cases just noted, and in those cited in the opinion of the Court, as well as in the principal case, the inquiry referred to a state or condition not complicated with a question of law. A witness cannot give his opinion as to what the law is, either directly or indirectly, unless that is the very issue involved or the subject of inquiry, as when it relates to the law of some other jurisdiction, and he is called as a professional expert to prove it. That a nonexpert should not be asked a question requiring him to express his opinion upon a question of law would seem to be a proposition so plain as not to require any argument to demonstrate its correctness. He could just as well be asked if a will or deed had been properly executed. It is not the nature of the particular question of law involved, but the fact that it involves a question of law, which renders the witness incompetent to answer such a question.

This question is considered by me as very important to mark and preserve the true and proper distinction which separates competent from incompetent evidence; otherwise great injustice may be done in the trial of causes.

It would seem that the question asked in this case, as to the sufficiency of defendant's mental capacity to run a still, is so wide of the mark

when brought to the test of well settled rules of evidence as to be plainly incompetent. As a general rule, questions relating to character or to mental characteristics should be more general in form. If it was intended to show that defendant was weak-minded with a view of arguing upon that and other evidence or circumstances that he was an imbecile, or not endowed with sufficient sense or perception to distinguish between right and wrong, and therefore that he was incapable of committing a crime, the evidence would, perhaps, have been competent and admissible, but to ask a witness if the defendant had mental capacity sufficient to run or operate a whiskey still would depend more upon his actual knowledge of such matters, acquired by his experience, than upon his mental ability or his natural skill. It does not, we imagine, require any high order of intellect, and certainly not of morals, to run or operate so simple a contrivance as a still, as very slight practice and experience would suffice in an ordinary case, as this was. The question was not as to his mental capacity to run a blockade still, but as to his capacity to distinguish between right and wrong, or the *capax doli.* As we say, and as the Assistant Attorney-General substantially puts it in his brief: Whether or not, then, Journegan had sense enough to operate a blockade still was not the question. The fact was, he was operating the still, and with apparent vigor and success, and the inquiry should be confined to the question whether he was criminally liable for his act: If he was too insane to know the quality of his act, that is, to know that it was wrong and forbidden by law (*malum in se or malum prohibitum*), and the witness had had opportunity for observing him sufficiently to enable him to answer the question intelligently, he could give an opinion upon his sanity, or insanity, at the time the crime was alleged to have been committed. *S. v. Ketchey,* 70 N. C., 621; *McLeary v. Norment,* 84 N. C., 235; *Whitaker v. Hamilton,* 126 N. C., 465; *S. v. Terry,* 173 N. C., 761; *S. v. Coley,* 114 N. C., 879. Exceptions 5 and 6 were to the court's overruling objections to the following questions: "Is Journegan sufficiently capable to buy a stilling outfit?" (He had already bought it, and with seeming good judgment, and was actually using it.) "Have you any idea what his income is from his estate?" The answers to these questions, in view of conceded facts, would have been plainly irrelevant as throwing no light upon the issue under investigation. Exception 7. Again, W. W. Green, a witness for the defendant, was testifying when he was asked this question, "Do you think he has sufficient mental capacity to operate an illicit distillery, and to know that it was wrong?" The same observation may be made upon this exception as was made upon exceptions 3 and 4. The opinion the witness was permitted to express was whether or not the defendant was insane, or of unsound mind, at the time. It was a matter for the jury, and not for the witness,

to determine whether or not he had sufficient mental capacity to operate a distillery and to know that it was wrong. The defendant himself, however, went upon the stand and testified in the presence of the jury, and there is not the slightest indication, in his own testimony, of any diseased state of mind which would prevent his knowing the illegal quality of the act he was engaged in; on the contrary, it shows distinctly that he knew that making whiskey was both illegal and morally wrong. There is no attempt in any of the evidence of the defendant to show that he had intervals of insanity and intervals of sanity. On the contrary, that evidence, if true, and taken in any aspect of it, would only show that he was not a man of normal strength of mind on account of his having had a sunstroke about 25 years ago. In any view of the case, it seems that the defendant was properly convicted and properly sentenced.

The fact that Journegan was present when the officers went to the place where the liquor was being manufactured, and the further fact that Journegan was in charge of the still, and was the leader of the "gang," so to speak, directing what was being done illegally at the place, would seem to rebut the idea that he did not know what he was about, or did not fully comprehend that he was committing an unlawful act.

If the evidence were admissible, its exclusion should be assigned to the class of harmless errors, and surely is not such a one as calls for a reversal of the judgment. Nothing of any importance would be accomplished by such a course. If a witness had testified that Journegan did not have sufficient mental capacity to know that what he was doing was illegal, the jury would not have believed him, and should not have done so, for the contrary was so palpably the truth, if we judge the defendant by his own conduct when he was caught at the still—*flagranto delicto.* Besides, his own and real defense was that he did not run the still—not that he did not know how to run it. He knew intuitively that it was wrong to make "blockade liquor," because when the officers appeared he took to his heels. Thus conscience does make cowards of us all, as Hamlet soliloquized, and there is nothing that has been more truthfully said and established in all the centuries. If this man did not know it was wrong to make blockade liquor, or any kind of liquor in these times, if he was so benighted as that, there was nothing to run from. He would have stood his ground in his ignorance and imbecility. · He exercised his mental faculties, felt consciously guilty, and fled instinctively before the pursuit of an offending law, represented in the person of its approaching officers.

The case is such a plain one, and defendant's guilt is so conclusively established, that there is, at least, no substantial error, as the basis of a new trial, which is granted only when there is prejudicial and not merely

theoretical error. Verdicts and judgments should not be lightly set aside upon grounds which show that alleged error to be harmless, or where the appellant could have sustained no injury from it. There should be at least something like a practical treatment of the motion to reverse, and it should not be granted except to subserve the real ends of substantial justice. Hilliard on New Trials (2 ed.), secs. 1 to 7. The motion should be meritorious and not frivolous. Graham and Waterman on New Trials, vol. 3, p. 1235. Courts are instituted to enforce right, and restrain and punish wrong. Their time is too valuable for them to interpose their remedial power idly, and to no purpose. They will only interfere, therefore, where there is not only error, but a prospect of ultimate benefit. *S. v. Smith,* 164 N. C., 475-480.

My conclusion is that there is nothing in this record to justify a reversal or any interference with the due course of justice.