## CORNELIUS G. DUNHAM AND ANOTHER: APPEAL FROM PROBATE.

Where it was claimed that a testatrix was insane at the time of the execution of her will, and, in support of this claim, evidence had been introduced tending to show that the sisters of the testatrix had at all times treated her with kindness, but that the testatrix had, nevertheless, harbored an irrational aversion towards them; and, in reply to this evidence, testimony was offered to prove that one of the sisters, in the absence of the testatrix and after the making of the will, had used an unkind expression in reference to the testatrix,—it was held that such testimony was admissible.

Where the sanity of a person is the matter in dispute, a non-expert witness may give his opinion, accompanied by a statement of facts within his own knowledge upon which he bases it, in regard to the sanity of the person in question; but he can not, even upon cross-examination and after having so given his opinion, be permitted to give his opinion upon the question whether a hypothetical set of facts would or would not, if true, be evidence of insanity.

Although a testator, at the time of executing his will, may harbor some insane delusions,—fancying things to exist which have no existence and of the exist-

ence of which he has no reasonable evidence,—yet, if he has mind enough to know and appreciate his relations to the natural objects of his bounty and the character and effect of the dispositions of his will, then he has a mind sufficiently sound to enable him to make a valid will.

APPEAL from a decree of a court of probate approving the will of Lucy Kelsey.

The appellants claimed, and offered evidence to prove, that Lucy Kelsey, at the time when she executed the instrument, was not of sound mind, but that she then was and had long been insane; and especially they claimed, and offered evidence to prove, that she entertained an unreasonable aversion to her sisters, who were her heirs at law, and that this aversion was wholly the result of an insane delusion. In support of this claim one of the sisters, introduced as a witness by the appellants, testified that all the sisters had treated the testatrix with uniform and uninterrupted kindness and had entertained for her the most sisterly affection,—notwithstanding which, the testatrix had harbored a strong resentment towards them for a course of years before her death and during her last sickness; that the witness and Abby Smith, another sister, had had an interview with the testatrix a few days before her death, at which time they both entertained and expressed the warmest affection towards the testatrix; and that the testatrix manifested a strong aversion to them.

This the appellees denied. Among other things they offered to prove by one Peck, that four days after the interview above mentioned, and five days after the making of the will, Abby Smith, while returning from a visit to the place where the testatrix was sick, on being asked by the witness how the testatrix was, replied, " she is too ugly to die yet." The appellants objected to this testimony, on the ground that Abby Smith was not a party to the record, and was not a witness in the case ; but the court admitted the evidence for the purpose of showing the feelings and temper of Abby towards the testatrix previous to the making of the will, and that Abby was not, on her part, on such terms of affection towards the testatrix as the appellants claimed.

Henry Nash Esq., a witness for the appellees, testified that

he was well acquainted with the testatrix and had frequently done business with her, and that she was, in his opinion, of sound and disposing mind. On his cross-examination the following question was put to him by the counsel for the appellants :—" If the testatrix harbored feelings of hostility and aversion to her sisters and relatives for a cause which did not exist, and she had no evidence that it ever did exist, and indulged in feelings of hostility towards them without any cause whatever, would that, in your opinion, be evidence of insanity ?" This question was objected to by the counsel for the appellees and the court ruled it out. It was not claimed that Nash was an expert, nor had any proof been made, at this time, of the facts assumed in the question. The court, however, did allow the appellants to ask the opinion of Nash in relation to the sanity of the testatrix, based upon any facts within his knowledge.

The appellants requested the court to charge the jury as follows :—

1. That if the testatrix harbored a delusion—that is, fancied things to exist which had no existence, and of the existence of which she had no reasonable evidence,—she was, while harboring such delusion, of unsound mind, and her will made at such time would be void.

2. That if the testatrix harbored an unreasonable antipathy to her sisters, not justly caused by any acts of unkindness or improper conduct on their part, and had no reasonable evidence of such unkindness or improper conduct, this would be a delusion and would constitute unsoundness of mind; and her will, made during the existence of such delusion, would be void.

3. That if the testatrix made this will under the influence of this unreasonable and unfounded aversion and antipathy to her sisters, and, in consequence of that aversion and antipathy, disinherited them, such will is void, although at the time of making the will she was in fact sane on all ordinary subjects."

The court did not so instruct the jury; but charged them as follows :—

" If the testatrix at the time of executing this will, harbored an unnatural and unreasonable antipathy towards her sisters, and that antipathy was the result of a morbid delusion as to the character and conduct of these sisters, the will is void, although she may have been sane in all other respects."

The jury rendered a verdict in favor of the appellees—and thereupon the appellants moved for a new trial.

*Welles* and *Chapman*, for the appellants.

1. The question proposed to Mr. Nash ought not to have been ruled out. It is immaterial whether he was an expert or not. He was permitted to express, on his direct examination, an opinion in favor of the sanity of the testatrix ; and we should therefore have been permitted, on the cross-examination, to ask what he meant by insanity, or what was his theory or test of insanity, and the grounds of his opinion. *Grant* v. *Thompson*, 4 Conn., 203. *Morse* v. *State*, 6 id., 9. *Kinne* v. *Kinne*, 9 id., 102. *Porter* v. *Poquonnoc Manufacturing Co.*, 17 id., 256. Freeman's Trial, 256.

2. The testimony of Peck was improperly admitted. 1st. Mrs. Smith was not a party, nor a witness. 2nd. Even if she had been a party with others, the evidence would not have been admissible. 3d. It did not conduce to prove even that for which it was confessedly admitted. *Phelps* v. *Hartwell*, 1 Mass., 71. *Atkins* v. *Sanger*, 1 Pick., 192. *Lightner* v. *Wike*, 4 S. & R., 203. *Bovard* v. *Wallace*, id., 499. *Nussear* v. *Arnold*, 13 id., 323, 328. 2 Greenl. Ev., § 690.

3. The first instruction prayed for by the appellants ought to have been given to the jury. The terms in which that proposed instruction is couched are within the very definition of insanity, the fancying things to exist which have no existence. *Dew* v. *Clark*, 3 Addams Eccl. R., 79. Chitty Med. Jur., 358, 361. Dean Med. Jur., 533, 543. 4 Phil. Ev., (C. & H.,) 293.

*Hubbard* and *S. E. Case*, for the appellees.

1. The evidence of Peck was properly admitted. 1 Greenl. Ev., §§ 102, 108.

2. The question put to Mr. Nash was properly disallowed. 1 Greenl. Ev., § 440. *Lester* v. *Pittsford*, 7 Verm., 161. *Hathorn* v. *King*, 8 Mass., 371. *Dickinson* v. *Barber*, 9 id., 225. *Needham* v. *Ide*, 5 Pick., 510. *Grant* v. *Thompson*, 4 Conn., 203. *Morse* v. *State*, 6 id., 9. *Kinne* v. *Kinne*, 9 id., 102. *Gibson* v. *Gibson*, 9 Yerg., 329. *Potts* v. *House*, 6 Geo., 324. *Rambler* v. *Tryon*, 7 Serg. & R., 90.

3. The charge of the court was correct as to the mental capacity of the testatrix. *Dew* v. *Clark*, 3 Addams Eccl. R., 79.

ELLSWORTH, J. Several questions have been made in this case which we will consider in the order in which they are presented.

1. It is claimed by the appellants that the testimony of Peck, a witness who was called by the appellees, was improperly admitted. He testified that Abby Smith, a sister of the testatrix, a few days before the death of the latter, while returning from the house where she was sick, on being asked by him how the testatrix was, replied, " She is too ugly to die yet." This we think was properly received, to show the feelings of the said Abby towards her sick sister at that time. Language is the natural and ordinary evidence of the speaker's sentiments and feelings. This testimony was made proper and material by the appellants having claimed and introduced evidence to prove, that at the very time when the words were spoken and at all times before and after, said Abby and her sisters had treated the testatrix with continued and uninterrupted kindness and at the time entertained for her the most sisterly affection. The appellants had claimed that the alienation of the testatrix from her sisters was without cause, and therefore so unnatural as to show that her mind was diseased and insane in giving them nothing in her will, while they entertained and expressed uniform affection for her. The appellees denied that said Abby was kind to her sister, and insisted that she and her sisters had treated her with continued neglect and unkindness, and so had their husbands and family connexions, and that she had received

many wrongs and injuries at their hands. We perceive no error in this part of the case.

2. The next error complained of is, the refusal by the court to allow the question to be put to Mr. Nash on his cross-examination, whether, if the testatrix harbored feelings of hostility and aversion to her sisters and relations for a cause which did not exist, and she had no evidence that it ever did exist, and indulged in feelings of hostility towards them without any cause whatever, it would in his opinion be evidence of insanity.

It was not claimed that Mr. Nash was an expert or was called to testify as such; nor at that time had there been proof introduced of the facts assumed in the question. Besides, the court did consent that the question, based upon any facts within the witness' knowledge, might be answered.

The only ground upon which this question can be claimed to be proper is, that it goes to test the judgment of the witness as to what in his mind constitutes insanity; for it is not and can not be claimed that Mr. Nash, not being an expert, could be asked in chief for an opinion merely, on hypothetical facts. It is claimed that, as he had testified in chief for the appellees, " that he was well acquainted with the testatrix and had frequently done business with her, and knew the character of her mind, and that she was in his opinion of sound and disposing mind," the cross-question became proper.

Some of the court have doubts if this cross-examination is not so within the discretion of the court, whether to allow or not the putting such an hypothetical and complex question, as not to be the subject of error; but be that as it may, we all think that the question should not have been allowed, at least not to any greater extent than it was allowed by the court.

It is very true that Mr. Nash had expressed an opinion as to the sanity of the testatrix, but as the opinion of a non-expert it was not, as a mere opinion, admissible or important. We never allow the mere opinion of a witness to go to the jury if

objected to, unless the witness is an expert and testifies as such, where the jury from want of experience or observation are unable to draw proper inferences from facts proved. But where a witness speaks from his personal knowledge, and, after stating the facts, adds his opinion upon them, or, in a certain class of cases, gives his opinion without detailing the facts on which it is founded, his testimony is received as founded not on his judgment, but on his knowledge. As for instance the case of personal identity ; where the witness may say that he knows the man, and that the person whom he saw was that man, and he is not obliged, unless requested, to state his height, size, age, complexion, gate, voice and dress. So a witness may state that a certain road is or is not in repair, or that a certain bridge is sound and safe or otherwise, or that a farm or horse is worth so much, without going into the particular facts on which he founds his opinion, these facts being known to him personally. He only states in such cases the result of his own observation and knowledge. Wherever the particulars are quite numerous a witness is allowed to testify what he knows as the result of his observation of facts, and thus to testify to the general fact, rather than to recite every circumstance that conduces to that knowledge. This is a rule of convenience which must be applied on trials, unless they are to be indefinitely protracted by a useless minuteness of enquiry. This rule has been very generally, in this country, applied to the case of insanity. It prevails in the ecclesiastical courts in England, but not in their courts of common law. It has always prevailed in this state. Every professional man knows that it has been again and again sanctioned in this and in all our courts. I do not remember a contested case of insanity, whether upon a will or deed, where the witnesses have not expressed their opinions as the result of facts within their own observation and knowledge. *Grant* v. *Thompson,* 4 Conn., 203. *Comstock* v. *Hadlyme,* 8 id., 265. *Kinne* v. *Kinne,* 9 id., 102. *Porter* v. *Poquonnoc Manufacturing Co,* 17 id., 249.

In *Potts* v. *House,* 6 Georgia, 324, this subject is discussed with very great learning and ability. The court held that

the opinions of physicians in relation to the sanity of a testator are admissible, whether founded on facts coming within their own observation or as testified to by others; and that subscribing witnesses to a will may give their opinion, as is done in all the English courts; but that the mere opinions of witnesses, other than physicians and attesting witnesses, are not admissible unless accompanied with a statement of the facts on which they are founded; and that such witnesses, after having stated the appearance, conduct, conversation or other particulars from which the state of the testators' mind may be inferred, may be allowed to express their opinion as the result of these facts, that is, as their own knowledge. Reference is made to the case of *Clary* v. *Clary*, 2 Iredell Law R., 78, where judge Gaston, giving the opinion of the court, states the same doctrine and cites many cases in support of it. He remarks that it is impossible for the witnesses to specify and detail to the jury all the minute circumstances by which their own judgment was determined, so as to enable the jury by inference from these facts to form their own opinion.

It appears to me that the distinction here made is the true one applicable to this class of cases. The judgment of a witness, founded on actual observation of the capacity, disposition, temper, character, peculiarities of habit, form, features or hand writing of others, is different from and more than a mere opinion of an expert. It approaches to knowledge, and in fact is knowledge so far as the imperfection of human nature will permit knowledge of these things to be acquired, and such knowledge is proper evidence for the jury.

In *Gibson* v. *Gilman*, 9 Yerg., 330, the court decide that attesting witnesses, and they only except experts, are permitted to give their opinion merely and without cause or reason assigned, of the testator's state of mind; and that the opinions of other witnesses who are not experts are not evidence unless accompanied with a statement of facts within their own observation and where the opinion is the result of such observation. This was likewise held in the case of Vanauken, an alleged lunatic. 2 Stock. Cha. R., 190.

In *Rambler* v. *Tryon*, 7 Serg. & R., 95, the same doctrine is held in a case exceedingly resembling the present. The witness had testified in chief, as here, to the capacity of the testator in his opinion, founded upon his knowledge and observation of his conduct, conversation, &c. On the cross-examination he was asked what his opinion would be on a different state of facts. The court decided that the question was an ensnaring one, to which the witness might justly have excepted, and that it was improper; that a witness must draw his opinion from facts within his own knowledge and observation, and not from the knowledge and observation of others,—that the witness was not bound to give an opinion on an assumed state of facts or facts sworn to by other witnesses, the reason given being that opinion is not evidence without the facts on which it rests. To give such latitude as is claimed to a cross-examination, the court say would be trying a cause, not by the evidence of facts and opinions formed by the witness from his own observation and knowledge, but upon hypotheses and facts stated by others, unknown to the witness.

We presume that the appellants' counsel would not have claimed the testimony had it been called for in chief. But it is claimed that it might be put on cross-examination for the purpose of testing the judgment of the witness. We think however that this makes no difference. It certainly was not so regarded in the last case cited; and we think it ought not to on principle. The mere opinion, without knowledge, of a non-expert, is opinion still. It is an inference from hypothetical facts formed by a person who avowedly has no qualification or legal competency to form an opinion. In the nature of the case it must be so.

3. We come next to the most interesting and the main question in the cause, the law in relation to the subject of insanity. The appellants' counsel requested the court to lay down three distinct propositions on this point. Two of these, the second and third as stated in the motion, were laid down substantially as requested by the appellants, and so

far they of course can not complain. We proceed at once then to consider the correctness of the first proposition.

As we understand this proposition, the principle of law which it assumes is, that a delusion harbored in the mind on any subject, makes the mind so unsound generally, that, as a matter of law, a will made during its existence is void as the act of an insane man ; or in other words, that a delusion on any single topic, is, as matter of legal inference, absolute insanity, sufficient to vacate a will or contract; and by parity of reason it would seem, affording immunity in the case of crime, unless indeed, as is laid down in some of the books, more understanding is required in the case of wills and contracts than in the case of crimes.

Now on the trite subject of insane delusion, so much has been said and written by the learned—so many discordant views and theories advocated by medical and other writers, and even these sometimes stretched and distorted to save life or defeat a hard will, that we scarcely dare say what is the true rule of law on the subject. The particular physical theory too of the human mind adopted by some persons, very greatly influences their views about insanity; as for instance, the phrenologists, who maintain that the mind is not a unit, and that it often is diseased and enfeebled in some of its faculties or organs of manifestation while it is sound and healthy in others, and as to these sound faculties is properly chargeable with responsibility for their exercise while it is not as to the others.

Some of the distinctions made I must think do not furnish certain and satisfactory rules for the government of courts and juries in the administration of either the civil or criminal law. After having examined, and somewhat thoroughly read, the treatises and reported cases brought to our notice on the trial, and reflected upon facts that have fallen under my own observation during forty years spent at the bar and on the bench in numerous trials in our courts, I am convinced that the question of a man's ability to make a contract or will, or of his legal responsibility for his actions, is best determined by calling the attention of the court and jury to two

plain questions of common sense : 1st. What degree of mental capacity is essential in such cases ?—which is a question of law; and 2d. Does that capacity exist in the case in hand ? which is a question of fact. Refinements and speculations beyond this can avail very little in my judgment; and to indulge in them will confuse more than enlighten the minds of the jury ; and, after all, it will come to these questions, whatever technical rule may be laid down by the court.

What better rule, what more simple or easy of application, can be devised than these ? especially as it respects the jury, who are not necessarily learned men nor familiar with the refinements of phrenological or physiological science or with the pathology of mental disease. All the books agree that a person has capacity to make a contract if he be of mature age, and can understand the nature of the contract and the effect of the language used to express his intention : and certainly the fact whether there be or not such a capacity, must be judged of by scanning the daily conversation and conduct of the individual in matters of a like nature, and not by enquiring if in some particular thing in no way relating to property or contracts, he fancies something which does not exist, and of which he has no reasonable evidence. The fact of such delusion may well go to the jury for what it is worth upon the general question of unsoundness of mind, but it is not absolute and universal unsoundness. To hold it such would be unendurable, and at variance with the doctrine practically recognized in all courts, and with the good sense of all mankind. Were we to decide that men cannot make contracts nor dispose of their estates, however sensible and shrewd, because they fancy some things to exist which do not, and of which they have no reasonable evidence, at least so far as other persons can perceive, our courts would ere long present the spectacle of a plentiful harvest to the profession or the affairs of society must be arrested from uncertainty and fear. What would be the condition of those who happened to have dealings with a jealous husband, a suspicious neighbor, an infatuated lover, a deceived and half crazed demagogue, a Hindoo worshipping an idol, a sincere and

enthusiastic but deluded follower of Mahomet, or a modern spiritualist with his "harmonial philosophy" and "aerial spheres?" Are these men to be read out of society as insane on all subjects, and rendered powerless to provide for themselves and their families?

Lord Hale had full belief in the existence of witches, while he presided with distinguished ability in the highest court in England. Dr. Johnson was confident that he heard the voice of his deceased mother calling his name. Lord Castlereagh, a short time before his solemn death, gave a narration of a supposed apparition which he firmly believed and which deeply affected him. Lord Herbert believed that a divine vision had indicated to him the correctness of a particular course of religious speculations, which, on the faith of the supposed vision, he published, and which he made the basis of his future action. The second Lord Littleton was equally persuaded that a divine warning had admonished him of his approaching death. The same was true of the Earl of Chesterfield. Abercrombie gives an instance of an habitual hallucination which at the same time was consistent with reason. Now we say, these things did not, in the individual cases, constitute what we understand by the term insanity, nor of course general unsoundness of mind, though such facts may be evidence tending to prove insanity, and, taken with other facts of a more marked character, may satisfy a jury that a man has not mind enough to make a valid will and testament. The proper inquiry in such cases is, has the testator mind enough to know and appreciate his relations to the natural objects of his bounty, and the character and effect of the dispositions of his will. If he has, then he has a sound and disposing mind and memory, although his mind may not be entirely unimpaired.

In *Kinne* v. *Kinne*, supra, this court held that the real question was whether the testator had an understanding of the nature of the business he was engaged in, a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it, and of the manner in which he meant to distribute it among them. Judge Williams there

says, "The mistake has arisen from the fact that if the testator was not in a condition which would justify his transacting all kinds of business, it has been supposed he could not do this." So in *Comstock* v. *Hadlyme*, 8 Conn., 265, the question for the jury was, whether the devisor had a sound and disposing mind, and the court gave the rule above stated.

In *Stevens* v. *Vancleve*, 4 Wash., C. C. R., 262, Washington, J. says, "The testator may not have sufficient strength of mind and vigor of intellect to make and digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. The question resolves itself into this, were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged." The same rule is laid down in *Rambler* v. *Tryon*, 7 Serg. & R., 95, *Hawthorn* v. *King*, 8 Mass., 371, *Law* v. *Williamson*, 1 Green. Ch., 82, *Stewart* v. *Lispenard*, 26 Wend., 255, and *Potts* v. *House*, supra. See also 1 Jarman on Wills, 29, and the numerous cases referred to in the notes.

We will not dwell longer on this part of the case, and should not have said so much as we have, had we not felt that the notion that a single delusion is general insanity, and that the jury are to be so instructed, irrespective of the degree or intensity of it, is no where countenanced in this country, and not until lately in England.

The rule in England was for a long time the same as the one above laid down, and is most elaborately argued by Nicholls, J. in the prerogative court in *Dew* v. *Clark*, 3 Addams Eccl. R., 79. There the question was, whether the testator's delusion as to his daughter was sufficient to set aside a will disinheriting her. It was held that it was. But no such point was decided as is made here, that a delusion on any other subject was a general unsoundness of mind, much less, absolute insanity, as matter of law. This notion being alluded to, the court say, "it has been repeatedly said by the counsel for the residuary legatees that this partial insanity is a something unknown to the law of England. Now if it be meant by this that the law of England never deems

a person both sane and insane at the same time upon one and the same subject, the assertion is a mere truism. But if by that position it be meant and intended, that the law of England never deems a party both sane and insane at different times upon the same subject, and both sane and insane at the same time on different subjects, there can scarcely be a position more destitute of legal foundation, or rather there can scarcely be one more adverse to the current of legal authority." The learned judge sustained himself by the authority of Locke, who says, " A man who is very sober and of a right understanding in all other things, may in one particular be as frantic as any man in Bedlam;" and of Lord Hale, who says, " There is a partial insanity of mind and a total insanity ; in the first as it respects particular things or persons, or in respect of degrees, which is the condition with very many, especially melancholy persons, who for the most part discover their defect in excessive fears and grief, and yet are not wholly destitute of the use of reason."

This question came up again in the Privy Council, in *Waring* v. *Waring*, (Privy Council Cases, 349,) where, in the opinion delivered by Lord Brougham, it would seem as if all distinction between partial and total insanity is denied.   Perhaps such is now the law of England, but in a very late treatise, written with much ability by Wharton and Stille, (Med. Juris., 27, 28, 32,) this is held to be an innovation, and is reviewed and disapproved of as leading to absurd and dangerous consequences.

Besides, if the law be taken to be as laid down in *Waring* v. *Waring*, this will not sustain the broad claim of the appellants in this case, that any delusion harbored in the mind, on any subject however foreign, is *per se* and as matter of law, absolute and universal unsoundness of mind.   And further, it may be important to remember that in the ecclesiastical courts in England there is no jury trial, but the fact and the law go together to the court, and a nice distinction between them on such a question as that of insanity is not necessary, nor is the court required to settle any narrow and abstract rule on the subject.   There, all the evidence is with the court,

and the court can decide whether there is a general or partial insanity, and if the latter, whether it is so great or so extensive in its relations as to affect substantially the entire understanding. We can well see, that while the court would not be embarrassed on the whole evidence, a jury who are to receive a technical rule from the court, as was here asked, might be unable to render a verdict according to their own convictions of the real fact. They might find that the person said to be under a delusion was abundantly competent to dispose of his estate, and feel that it would be absurd and unjust to render a verdict of insanity, while yet such a rule of law as is claimed by the appellants would, if laid down by the court, require them to do so. But even this would not appear quite so absurd in England as here, for there proceedings are instituted to try the specific question of the insanity under a commission of lunacy.

It seems to be admitted that the rule does not apply in criminal trials. Monomania, or partial insanity, is recognized in criminal law, and its effect in relation to criminal responsibility tolerably well settled, and we find that such insanity has often been successfully set up in defence of the accused. In submitting such cases, the judge always instructs the jury that they must inquire into the condition of the prisoner's mind at the time of the act, on the particular subject to which the crime relates, and though the language used by the different judges is somewhat variant, it is the same in effect. They all agree that the question is, whether the person accused had, at the time of the act, sufficient understanding to know the nature and effect of the act for which he is put on trial, and that it was a violation of law exposing him to punishment. If so, they say that he may be found guilty.

I will cite only two cases to this point, both of which are deservedly of the highest authority. The first is that of *Commonwealth* v. *Rogers*, 7 Met., 500, where the learned chief justice Shaw says, " On the contrary, although the prisoner may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences—if he has a knowledge that it is wrong and criminal, and a mental

power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment—such partial insanity is not sufficient to exempt him from responsibility for criminal acts." The other case is that of Daniel M'Naughton in the House of Lords, 47 E. C. L., 129, where the opinion of the judges was asked upon the following questions: "1st. What are the proper questions to be submitted to the jury when a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons is charged with the commission of a crime, (murder, for example,) and insanity is set up as a defence? 2d. In what terms ought the question to be left to the jury as to the prisoner's state of mind at the time? 3d. If a person under an insane delusion as to existing facts commits an offence in consequence thereof, is he thereby excused?"

The answers to these questions are full and explicit to the effect that in the opinion of the judges there is a clear dis= tinction between total and partial insanity, and of course a corresponding difference in the accountability of the offender. They say that if the accused was at the time of the act con- scious that the act was one which he ought not to do, and was contrary to the law of the land, or if he had a sufficient degree of reason to know the nature and consequences of his act, he would be a proper subject of punishment, even to the total loss of liberty or life.

Why ought not the same rule to be applied in civil causes? Is life or liberty less important than property or civil rights? If a person possesses reason enough to be held accountable for his criminal acts, he may, it appears to me, have enough to obligate himself by contract and make a good and valid disposition of his estate. The reasoning of Dr. Ray on this subject, in his late and able treatise on insanity, p. 16, is most worthy of attention. "The language of the law virtually addressed to the insane man is, your reason is too much im- paired to manage your property; you are unable to distin- guish between those measures which would conduce to your profit and such as would end in your ruin, and therefore it is

wisely taken from your control; but if, under the influence of one of these insane delusions that has rendered this step necessary, you should kill your neighbor or steal his property, you will be supposed to have acted under the guidance of a sound reason, and will be tried, convicted and executed, it may be, like any common criminal whose understanding has never been touched by madness. As for any physiological or psychological ground for this distinction between the legal consequences of the civil and criminal acts of an insane person, it is in vain to look for it. That the mind when meditating a great crime is less under the influence of disease and enjoys a more sound and vigorous exercise of its powers than when making a contract or a will, few will be hardy enough to affirm, and yet the practice of the law virtually admits it. The difference, if there be any, would seem to be all the other way. In the disposal of property the mind is engaged in what has often exercised its thoughts, the conditions and consequences of the transaction require no great mental exertion to be comprehended, and there may be nothing in it to deprive the mind of all the calmness and rationality of which it is capable. Now criminal acts, though abstractly wrong, may under certain circumstances become right and meritorious; and if the strongest and acutest minds have sometimes been perplexed on this point, what shall we say of the crazy and distracted perceptions of him whose reason shares a divided empire with the propensities and passions."

On the trial of this cause there was very little if any evidence, and little or nothing said, as to any delusion in the mind of the testatrix except on the subject of her property and the right of her sisters as her natural heirs to receive it at her death. Now, as to the effect of this supposed delusion, we think the court went quite far enough in the charge. The court said, "If the testatrix, at the time of executing the will, harbored an unnatural, unreasonable antipathy towards her sisters, or either of them, and that antipathy was the result of a morbid delusion as to the character and conduct of these sisters, the will is void, although she may have been sane in

all other respects." The jury have therefore found that the testatrix was laboring under no delusion at all, which ought, it would seem, to put an end to the case so far as the question of insanity is concerned, and, this being so, it is not easy to see of what benefit a new trial will be to the appellants beyond the chance of another verdict, which of course constitutes no reason with us for granting a new trial. But our decision is not affected by this view of the case. We hold that the legal proposition expressed in the first request to the court is not a sound one, and does not state the true principle of the law of insanity. A new trial is not advised.

In this opinion the other judges concurred.

New trial not advised.