HON. F. P. POCHÉ,
HON. R. B. TODD,
HON. WM. M. LEVY,
HON. C. E. FENNER, } *Associate Justices.*

---

No. 7689.

MRS. S. S. B. KINGSBURY ET AL. VS. J. S. WHITAKER, EXECUTOR, ET AL.

Partial insanity does not render a person legally incapable of making a will.

Even persons subject to complete insanity, if they have lucid intervals, may make a valid will during those intervals.

The test of the law on the subject is, whether, at the moment of making his will, the testator was of sufficiently sound mind to fully understand the nature of the testamentary act and appreciate its effects.

When the will was made by the testator himself, unaided by others, and its provisions and expressions are sage and judicious, containing nothing "sounding to folly," it will be presumed, even in the case of a person habitually insane, that it was made during a lucid interval; and the burden of proof will be on those who attack it, to show insanity at the moment when it was made.

English, French and American authorities reviewed.

APPEAL from the Second District Court, parish of Orleans.  *Tissot, J.*

Merrick, Race & Foster, for Plaintiffs and Appellees.

J. S. & J. T. Whitaker, for Defendants and Appellants.

The opinion of the Court was delivered by

POCHÉ, J.  This is a contest over the will of G. M. Bowditch, a resident of this city, who died in Sherborn, Massachussetts, on the 1st of August, 1877, and whose succession was opened and is now pending in

the Second District Court of the parish of Orleans.   The plaintiffs, widow Sarah Kingsbury, a sister, Granville Bowditch, a brother, William B. H. Dowse, a nephew, and Deborah P. Dowse, a niece, of the deceased, seek to have said will annulled on the ground of the insanity of the testator at the date of the will, and for several years before.

Defendants filed a general denial, and specially deny that at the date of said will the testator was of unsound mind, or, in any way, incapacitated from making a will.

The judgment of the lower court was in favor of plaintiffs, annulling the will and rescinding all orders for the probate and execution of the same, and defendants have appealed.

The will was made in this city, under the olographic form, and is in the following words:

"New Orleans, June 24th, 1876.

" Knowing the uncertainty of human life, I, Galen Melvin Bowditch, make this my last will and testament.   Having never been married, and having no children, I give and bequeath all my property, real, personal, and whatever I may die possessed of, to my sister Mary Ann Bowditch, now married to Samuel Fiske, in the town of Sherborn, Massachusetts.

"I appoint John S. Whitaker executor of this my last will, with seizin of my estate.                              G. M. BOWDITCH."

The case has been very warmly and ably contested; the evidence is very voluminous, and somewhat conflicting, but after a careful perusal and comparison of all the testimony, aided by the able briefs of counsel in the case, we are compelled to disagree with our learned brother of the District Court in his conclusion that G. M. Bowditch was of unsound mind, and under mental incapacity to make a valid will on the 24th of June, 1876.   Sanity, or soundness of mind, being the natural condition of man, insanity is never to be presumed, but must be affimatively and contradictorily established.   This rule, which is founded on reason and common sense, is sanctioned by the jurisprudence of England, France and of our own country, and has been consecrated by the most distinguished authors on this subject.   This wholesome rule has a peculiar application in a case like this, when the will, written by the testator himself, presents a series of wise and judicious dispositions, contains no contradictions, no extravagance, not a sentence, not a word indicating that it was the offspring of a " mind diseased," and it throws upon the heirs attacking the will the burden of proof of the unsoundness of mind of the testator at the date of the testament.   21 A. 60. This task was undertaken by the plaintiffs, and, in our opinion, they have failed.   After a close inspection of the record, which contains nine hundred and two pages, we have gathered the following facts which bear upon this controversy:

Galen Melvin Bowditch, a native of Massachusetts, moved to and settled in Louisiana in the year 1830.

By reason of his early experience in marine affairs, he was soon employed in the service of the United States Customs as Boarding Inspector at the Southwest Pass of the Mississippi river, in which employment he was retained for twenty-five years.

With a good salary, and living in a dreary and lonely place, where he had few or no opportunities of spending his means, being naturally industrious and economical, he soon accumulated some money, which he invested mainly in railroad, insurance and bank stock and other securities. After the war, and during the damaging administrations which controlled the destinies of our State, and under the various financial commotions which shook the whole country, his investments were subjected to serious losses, and his handsome competency was materially reduced. These circumstances, coupled with the character of his associations, and the habits contracted at the Balize, mainly his too free indulgence in ardent spirits, preyed upon his mind, and rendered him, as he says in one of his letters to his favorite sister, Mrs. Fiske, irascible, sad and despondent.

Under these exciting causes, he became subject to delirium tremens, manifested by paroxysms of rage and violence bordering upon madness, and producing temporary or intermittent insanity.

These attacks, rendering him intolerable and at times dangerous, he was frequently arrested and confined, sometimes in jail and three times in different insane asylums.

One of these attacks occurred in the year 1874, in Massachusetts, where he was visiting his relatives ; it was of unusual violence, and culminated in his incarceration in the Worcester asylum of that State.

This circumstance drew the earnest attention of his relatives to his condition, and some of them, not from a feeling of kindness for him, but of keen interest for the safe-keeping of his fortune (which was exaggerated), were instrumental in procuring his direct confinement, and from that time, were relentless in their efforts to deprive him of the administration of his property.

This is apparent from a letter of Rev. Mr. Dowse to Mr. Peterson, on Sept. 18, 1874, and by the course of Dowse, jr., in the interdiction proceedings instituted by him on the 24th of June, 1876. And the evidence fails to show that at any time the Dowse family had given proof of any particular friendship or kindly feelings for the deceased.

A great deal has been said about the insane delusion under which the deceased had conceived an unfounded prejudice against the Rev. Mr. Dowse and his children, as well as against Mrs. Kingsbury and Granville Bowditch.

It is manifest that he had no fondness for them, especially the Rev. Mr. Dowse, whom he styled an "orthodox thief" in one of his letters. But we fail to see any insane delusion in this circumstance. This antipathy resulted from natural causes, and sprang up long before any suspicion arose as to the soundness of his mind, and, in our opinion, it was rational and well founded. In a letter of the 17th of November, 1864, to his sister, Mrs. Fiske, the testator, who was paying to Rev. Mr. Dowse $3 a week, for the board of his mother, complains that Dowse had called for an increase of board, on the pretext that the old lady gave too much trouble to his daughters, and Bowditch uses the following language about the reverend gentleman : "I felt very much irritated to think he should want me to pay more, and to hire a house, particularly at this time when my affairs look so bad, therefore I wrote him a very abrupt letter, perhaps too much so."

And the same feeling prevails in every letter when he happens to mention him. He also complained of his other relatives, to whom he had at times loaned money, and who declined to settle with him, even when requested to turn it over to Mrs. Fiske, his sister, who was very poor, in debt, and in need.

These feelings of coolness and apathy were kindled and crystalized into hatred and rage when he discovered that these same relatives had co-operated in having him incarcerated in the Worcester Asylum.

Soon after his release from that asylum, in a letter to a friend, on October 30th, 1874, he uses the following language : "You will recollect the day I saw you in Boston, and that I promised to meet you the next day at the 'Advertizer Building.' I went there and could not find you. The same day I heard that Dowse was trying to get me back again at Worcester Asylum, and as I have no friends at Ashland or Sherborn, they care nothing further for me than to get my money ; I concluded to return at once to New Orleans, and get clear of the d—d s. Here I have friends, and Dowse would stand a worse chance than I did at Sherborn."

In addition to close reasoning, and a remarkable composition for a man recently released from an insane asylum, this letter shows very good reasons for the bitterness of the testator's feelings for his "orthodox brother-in-law."

Another feature of incurable insanity, relied upon by plaintiffs, is in his mania for picking from the streets cigar stumps, rags, garbage, and other stuff, and carefully storing the same in his room as valuables. This certainly proves an acute mania, and partakes of the nature of insanity, but it appears from the evidence that this mania was apparent only during his attacks of *mania a potu*, and were brought about by the same causes which we have heretofore described and accounted for ;.

and these circumstances fail to show insanity or mental incapacity to make a will or enter into a binding contract at the date of the execution of this will.

In the case of Chandler vs. Barrett, reported in 21 A. 60, it was proved that the testatrix had once ran upon the roof of a house, trying to escape from an imaginary robber; that she once burned all her clothing; that she suspected her children of intending to boil her in a kettle, and had committed many and more incongruous acts than those charged against the testator in this case, and yet the Court refused to set aside the will in that case. See, also, the case of Hebert, Tutor, vs. Winn, 24 A. 386. We fail to see how this mania of itself could incapacitate him from administering or disposing by will, or otherwise, of his property, especially as the evidence shows that he was at that time, and always, an intelligent and close business man; well posted on current events and financial developments. These qualities are conclusively shown by his letters, of which a great number are of record, and have been read by us with particular care and great interest. And it will be conceded that the letters of a man in the condition of Mr. Bowditch, covering a series of years, from 1864 to 1877, written before and after the occurrence of his fits of temporary insanity, afford the very best mode of judging of the soundness or unsoundness of his mind.

A careful perusal of these letters has satisfied us that Mr. Bowditch was not only not an idiot, an imbecile, or a confirmed maniac, but that he was a man of more than ordinary intelligence, of considerable learning, and with commendable facility of writing, a close observer of men, things, and of passing events, and of strong and ardent convictions on business, politics, political economy, and on many other subjects.

Plaintiffs rely with great confidence upon the testimony of experts, physicians, who had attended to Bowditch at various places and on different occasions.

Drs. Hunter, Logan and Stone, of this city, were examined on the subject. Neither of them was called to treat the deceased for mental disease, but all of them had been called to prescribe for a sore foot, which had caused him great suffering, confinement and trouble.

Dr. Logan does not state absolutely that Bowditch was insane, he says: "I can't tell what his state of mind was, because it seemed to be a kind of intermittent state of insanity."

Drs. Hunter and Stone venture to state that he was incurable, and that he must have been insane on the 24th of June, 1876, although they did not see him on that day, nor for several days or weeks before. The physicians examined in Massachusetts lean to the same opinion. It is evident that these physicians saw Bowditch only during his attack or paroxysms, and not during his lucid intervals. In the nature of things,

they were not sent for when the patient was quiet and causing no trouble to his friends or nurses.

But in a case of this nature and of this importance, we are not to be guided or influenced solely by the opinions of medical men, who have examined the patient under the most unfavorable circumstances, none of whom saw the deceased on the day that he wrote his will, or immediately before, or soon after the completion of the act. We take the opinions of the several physicians as worthy of the most careful examination, and the most respectful attention, to be weighed along with other testimony, and all to be considered together in assisting us to our own conclusion. 21 A. 60 ; 29 A. 302.

For the same reasons, we are not to be concluded by the judgment of interdiction pronounced against Bowditch, by the District Court, and now on appeal before this Court.

On the other hand, we attach great importance to the facts and incidents of the testator's life, as related by his sister and by her husband, by his life-long friends, and by those who were his daily and constant associates for many years.

When we are told by physicians and other persons that in 1873 the testator was insane and unable to administer his own property, we turn to his letters of that date, which are well written, in good style, well connected, full of wise reflections, showing a correct appreciation of all the author's surroundings, and comparing letters written by the deceased from and after the year 1873, to the end of July, 1876, with other letters written by him during previous years, as far back as 1864, we see no marked difference to justify the conclusion that his mind had been permanently impaired or disabled.

On the contrary, we detect the same style of writing, the same run of thought, the same views on politics, on the state of the country, on business, and on the various members of his family. In all of them we find repeated expressions of great friendship and growing fondness for his sister Mary Ann, the universal legatee, a legitimate solicitude for her welfare, great appreciation of the kindness and attention which she had shown him, and an unshaken determination to provide for her in his will to the full extent of his means. In support of these views we insert a few extracts from his letters.

In a letter of June 17th, 1874, written to Mr. Sinnott, from Ashland, Massachusettes, we find the following passage, which shows also that Bowditch was a hard drinker :

"Since I came here last everything seems to be so different, so improved, that the only way I can account for it is this : when I was here before I was ½ drunk all the whole time, and could not see beauties and improvements. There has been immense alterations and changes in the

city of Boston and vicinity. The roads are free of stones, houses prettily painted, with little and big flower gardens, blooming with flowers, I think they look so nice. I am now sitting in my sister's little parlor, so called. * * * My sister's little grand-daughter brings me my slippers, a glass of water, and says: 'God bless Melvin.' This is caused by kindness and candy, I presume."

When physicians tell us that Bowditch must have been insane on the 24th of June, 1876, we turn to his will, written entirely by himself, as shown by the testimony of Whittaker and Spearing, two witnesses of unimpeached character and veracity, who saw and conversed with him on that day and at that moment, to whom he spoke very rationally of his will, and we must conclude that the physicians are mistaken, and this conclusion becomes irresistible when we read the following passages taken from his letter of July 14, 1876 :

"Yours of the 9th instant, received a few moments ago. * * * I have read it to Mrs. Canterbury, she says you are worth all the rest of my relations at the North, and so says Melvin, your brother" (the writer).

"About my case (interdiction), the courts here are closed, and postponed during the hot summer, and I shall have plenty of time to make the defense before the case is called up. * * * It is a very pretty state of affairs for them to think I am incapable of managing and taking care of my own money that I worked hard and honestly for." * * *

"Peterson is here, and will assist me in all his power, which I think is very important, as his character is unimpeached. * * * I don't know what Mr. Lawyer Nutt could do in my favor out here ; if the case was in Massachusetts, he would be an important witness in my behalf."

It provokes a smile to read such reasoning from the pen of an unfortunate man, who was then sought to be, and was subsequently interdicted. We could quote many such passages from his numerous letters, but it would unnecessarily add to the length of this decision, which has already acquired formidable dimensions.

Our conclusion is, therefore, that on the 24th of June, 1876, G. M. Bowditch was of sound mind, fully capable of contracting and of making a valid will, and that his will of that date should be executed according to law.

It is, therefore, ordered, adjudged and decreed that the judgment of the lower court be annulled, avoided and reversed, and that plaintiffs' demand be rejected, with costs in both courts.

---

ON APPLICATION FOR REHEARING.

FENNER, J. The earnestness, ingenuity, and learning with which the application for rehearing in this case is pressed, and the growing

importance of the subject, have induced us most carefully to review the voluminous testimony found in the record, and, also, to consider and investigate very closely the legal principles by which courts should be guided in determining questions of testamentary capacity as affected by mental unsoundness.

The right of testamentary disposition is not, as suggested in the brief of counsel, a mere concession by the law, in favor of the testator, of a function, otherwise properly resting in the law itself, to decide what shall become of his property after his death.

It is not necessary that we should interpose in the disputes between Grotius and Furgole on the one hand, and Vinnius and Bynkershoeck on the other, as to whether this right finds its origin in the law of nature or in the civil law. Suffice it to say, that the civil law recognizes it as a clear and distinct corollary of the right of property, *jus utendi et abutendi*, under which the owner, provided he harm no other, may destroy and annihilate that which belongs to him. If he may thus destroy it, and thereby defeat all possible control of the law, it is difficult to perceive why, in exercising the option of leaving it in existence, he should not have the right of determining its disposition after his death.

The law, moreover, recognizes its own unfitness to regulate such dispositions. Its absolute rules of inheritance necessarily ignore the myriad circumstances which should properly exercise their influence over the distribution of the dead man's estate, such as the differences in condition, sex, age, infirmity, necessity, of those equally related, and the claims of friendship, love, services, favors and kind treatment. It also considers the protection and care secured for old age or infirmity by the possession of this salutary power. "It is one of the painful consequences of old age," says Chancellor Kent, "that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives a man over the disposal of his property, is one of the most efficient means which he has, in protracted life, to command the attentions due to his infirmity."

Van Alst vs. Hunter, 5 John. Ch⁷, 159.

The desire thus to provide for his old age, and to secure such influence over his relatives and friends, is a just and efficient incentive to thrift and frugality ; and to be able, even in the shadow of death, to extend his bounty to those whom he loves and who have loved and cherished him, is a consolation in a man's declining years of which he should not be lightly deprived.

This hasty and partial review of the principles and motives underlying the freedom of testamentary disposition suggests and enforces the greatest reluctance on the part of enlightened courts to interfere with it. To wrest a man's property from the person to whom he has given it,.

and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than *post mortem* robbery, which no court should sanction, unless thoroughly satisfied, either that the dispositions of the will are reprobated by law, or that the testator was legally incapable to make a will. The testator, in the present case, has violated no provision of the law. His will is legal in form. Its dispositions are appropriate and conflict with no requirements of public policy or of natural duty.

It is not within the description of the *testamentum inofficiosum* of the Roman law, which only applied to wills disinheriting children or parents. The testator left neither ascendants nor descendants. The law imposes no obligation to provide for collateral relations, either during life or at death.

The position which the law assigns them in the order of intestate inheritance is based, in no degree, upon the idea of duty due them from the deceased, but simply upon the presumption of affection ; and when this presumption is rebutted by the facts, their claim has nothing to rest on and falls to the ground.

A man hath as complete liberty to deprive them of any share in his estate as if they were strangers to his blood. This testator, however, has not displayed forgetfulness of the ties of consanguinity. He has left his entire estate to a sister ; and those who attack his will are only equally related. They charge that the will is void by reason of the incapacity of the testator, in that he was not of " sound mind."

Accepting (as we most unreservedly do) the teachings of both natural and revealed religion, that the human mind is an independent and imperishable entity, merely temporarily embodied in the human frame, and connecting this idea with the teachings of modern physiology, it may well be doubted whether there is sufficient evidence of the existence of any such thing as an unsound mind.

A most acute and learned writer on the pathology of insanity says : " It is an undoubted truth, that the manifestations of the intellect, and those of the sentiments, propensities and passions, or generally of the intellectual and affective powers, are connected with and dependent upon the brain. It follows, then, that abnormal conditions of these powers are equally connected with abnormal conditions of the brain. But this is not merely a matter of inference, the dissections of many eminent observers, among whom it is enough to mention the names of Greding, Gall, Spurzheim, Calmeil, Faville, Falret, Bayle, Esquiral and Georget, have placed it beyond a doubt.

Ray's Med. Jur. § 50.

He proceeds : " The various diseases included in the general term, insanity or mental derangement, may be conveniently arranged under two

divisions founded on two very different conditions of the brain; the first being a want of its ordinary development, and the second, some lesion of its structure subsequent to its development. In the former of these divisions we have Idiocy and Imbecility—in the latter, Mania and Dementia." Ray, § 52.

"Whatever opinion may be entertained of the nature of the mind, it is generally admitted, at least by all enlightened physiologists, that it must, of necessity, be put in connection with matter, and that the brain is the part of the body, by means of which this connexion is effected." *Id.* § 123.

"Throughout the whole history of mania, in its various forms, we clearly discover the evidence of a bodily disease, of a suffering organ; and in not a fact respecting it can we discover anything anomalous, or at variance with the principles of diseased action." *Id.* § 127.

If it be admitted, then, that the brain is not the mind, but merely the physical medium or agency through which the mind manifests itself, we see no sufficient reason for assuming that structural defects or lesions of the brain, a purely physical organ, are mental diseases.

Modern pathology, though it has not reformed the ancient terminology, regards and treats insanity as a purely physical cerebral disease; of which there are infinite varieties, affecting different functions, some curable, others incurable, some permanent, others intermittent, some disordering only certain manifestations of the intellectual or affective faculties, others involving many of them, and some the whole.

The controversy between jurists as to the effect of *monomania*, or partial insanity, upon the will-making power, we think, may now be considered settled in favor of the humane theory, that such partial insanity does not necessarily destroy the capacity to make a will.

Troplong and Sacase adopt the opinion that the mind is a unity, and that, if it is diseased in part, it is diseased as a whole.

Troplong, Don. et Test., vol. 2, §§ 451-7.

Sacase, La Folie Considerée, p. 16.

On the other hand, the vast majority of writers on the civil law agree that insane delusions, monomania, or partial insanity, do not destroy the power of making a will if the testamentary action was unconnected with the particular derangement of the faculties.

Demolombe, C. N., B. III, T. 2, ch. 2, § 330.

2 Pothier, Ob. Appendix, 24.

Hoffbauer, Med. Legale.

Paris & Fonblanque, Med. Jur., 1, 302.

LeGrand de Saule, La Folie, p. 146.

Casteluan, Sur L'Interdiction des Aliénés.

Maygorri's Institutizioni.

In England, Lord Brougham held that " we cannot, in any correct-
ness of language, speak of general or partial insanity," because, he
says, " the mind is one and indivisible ;" and he holds that the mind
must be sound throughout in order to entitle a man to exercise the
power of will-making.

Waring vs. Waring, 6 Moore, P. C. C., 341.

The same rule was followed by Lord Penzance, who held that " if
disease be once known to exist in the mind of the testator, it matters
not that the disease be discoverable only when the mind is addressed to
a certain subject, to the exclusion of all others, the testator must be
pronounced incapable."

Smith vs. Tebbit, 1 L. R. Pro., 398.

The foregoing cases were clearly opposed to the doctrine of Sir
John Nicoll, in an older and leading case.

Dew vs. Clark, 3 Add., 79-205.

They have, moreover, been reviewed and distinctly overruled in a
recent case in the Queen's Bench. The testator was shown to have been
confined as a lunatic at a date some years prior to his death. After his
release he continued, to the day of his death, subject to delusions, such
as that he was followed and molested by a man who had been dead for
years, and that he was pursued by evil spirits whom he believed to be
visibly present ; but Lord Cockburn, Chief Justice, as the organ of the
Court, held that if these delusions did not have influence upon him in
disposing of his property, there was no ground for holding the will to be
invalid.

Banks vs. Goodfellow, 5 L. R., Q. B., 549 ; also Broughton vs.
Knight, 42 L. J. P., 25.

The current of American authorities is strongly in favor of Lord
Cockburn's view.

Thus, in one case, it is said : "Eccentricities of conduct, absurd
opinions, or belief in things appearing to us extravagant, although they
may be and are evidence of testamentary incapacity, do not necessarily
constitute it. A man may believe in witches and witchcraft, as it seems
this testator did, or, like him, he may have believed his health to have
been permanently affected by slow poisons, surreptitiously administered
to him, and yet be competent to make a will where such will is not
shown to have some connection with such absurd opinions or extrava-
gant beliefs."

Leech vs. Leech, 4 Am. d. J. N. S., 179.

In another case it is said : "A man may profess an absurd fondness
for music, and play the Pandean pipes, behave like a fool occasionally,
may tell his dreams, and call them visions, and believe them; he may be
addicted to telling lies about his will, yet we could not, on these ac-

counts, pronounce him unfit to manage his affairs, or dispose of his property."

Turner vs. Hand, 3 Wal. Jr., 120. See, also : 5 Ind. 137, 39 Miss. 19, 47 N. H. 120, 15 N. J. Chy. 52, 8 Watts 71, 24 Geo. 640, 43 Barb. 625, 24 Ala. 241, 1 Litt. 371, 2 R. S. 255, in which this subject is discussed from various points of view.

The Supreme Court of Connecticut, in a leading case, lays down the doctrine broadly, as follows : "If the testatrix had mind enough to know and appreciate her relations as the natural objects of her bounty, and the character and effect of the dispositions of her will, then she had a sound and disposing mind and memory, although her mind may not be unimpaired."

Durham's Appeal, 27 Conn., 192. ·

A learned author says : "There are many cases where mental health is impaired, where old age has caused a certain dilapidation of the mental structure, where there are curious mental eccentricities of thought and action, and, in all these cases, if the individual retains sufficient of the reproductive faculty to collect in his mind, without the suggestions of others, the particulars of the business in hand, and the possible objects of his bounty, if he has the power of retaining these in his mind a sufficient length of time to perceive their relations to one another, and if he is able to form a sound and rational judgment with respect to them, then he is, according to law, in a position to exercise this privilege of disposing of his own property ;" and in support of this he cites a multitude of authorities.

Browne's Med. Jur. of Insanity, § 23.

Again : "It is essential to the exercise of the testamentary power that the individual should be in condition to understand the nature of the testamentary act, and appreciate its effects, that he should know what property he has to dispose of, the claims that are upon him, and their relative importance, and should desire that his property should be disposed of in a certain manner."

Id., § 152.

Another writer thus summarises the doctrine of the English Ecclesiastical Courts : "The object is not so much to settle the question of soundness, or unsoundness in general, as it is in reference to the particular act. The principle is, that a person may be capable of testamentary acts, while technically and really unsound, and incapable of doing other acts requiring much reflection and deliberation, * * accordingly the testamentary capacity is to be determined, in great measure, by the nature of the act itself. If it.be agreeable to instructions, or declarations previously expressed, when unquestionably sound in mind, if it be consonant to the general tenor of his affections ; if it be consistent and co-

·herent, one part with another; and if it have been obtained by the exercise of no improper influence, it will be established, even though the medical· evidence may throw strong doubts on the capacity of the testator."

Ray, Med. Jur. of Insanity, ? 355, citing, 1 Hagg. 146, 577, 502; 3 ˙Hagg. 790; 2 Hagg. 142-84; 1 Lee, 130; 2 Lee, 229.

The doctrines thus expounded by judges and jurists command our unqualified approbation. The fact that a man is subject to disease of the brain is, *per se*, no better reason for depriving him of testamentary power than would be his having a disease of the liver. On the contrary, as we have seen, the liability to infirmity which is the inheritance of man, and the consequent need of care and attention, are amongst the most powerful reasons for testamentary freedom. The real question is, whether the brain or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of· the true wish or will of the testator, unbiased by any delusion which may be the result of such disease. The law fixes the time for the application of this test, at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even ·to complete dementia, to make a will in lucid intervals. When the will is established to have been made by the testator himself, unaided by others, and when its provisions and expressions are sage and judicious, containing nothing "sounding to folly," these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made.

Coin-Delisle, Don. et Test, pp. 81, 82.

3 Toullier, p. 45.

3 D'Aguesseau, pp. 367-8.

Swinburne, Test. and Wills, Part II, ? 3.

1 Phillimore, 90.

Scruby vs. Finch, 1 Adams, 74.

McAdam vs. Walker, 1 Dow. 178.

It is here fully established that Bowditch wrote his own will, without assistance from others, except in wisely asking beforehand the advice of his lawyer as to the necessary form. The only persons who testify as ·to his appearance and demeanor at and about the time of its execution, declare that they were thoroughly rational, composed and intelligent. The will is well expressed, and exhibits his consciousness of his right to dispose of his property in the mode adopted, by declaring that he had never been married, and had no children. The disposition in favor of

his sister is conformable to the state of his affections, as exhibited in a long series of his letters, extending over several years prior to his death, which fully establish that he loved her above all his other relatives, and more than any one else in the world ; and it, moreover, carries out an intention formed, expressed and persisted in, without variation, for many months prior to its execution. After a careful review of the evidence, we find nothing to shake our conviction of the validity of this will.

The evidence does establish that, prior to the will, Bowditch had been subject to occasional attacks of acute mania, which had twice necessitated his confinement in insane retreats for a short period. These attacks were not unconnected with excessive use of liquor, but they were doubtless complicated with, and aggravated by, cerebral disease. He was also exceedingly eccentric in his actions, and was certainly subject to a distinct monomania in his habit of gathering up trash, and even garbage from the streets, regarding it as having value, and storing it in his room. These symptoms indicated the existence of cerebral disease, which continued to increase, and doubtless culminated, some months after the making of his will, in continuous *dementia*. His letters, however, and the testimony taken as a whole, satisfy us that up to, and for sometime after, the execution of the will, Bowditch was, at nearly all times, possessed of every faculty necessary to the making of a will ; that he knew the nature and value of his property, and could at any time have made a correct inventory of it, as, on one occasion, he actually did ; that he thoroughly understood his right to dispose of it ; that he was, at all times, aware of the existence of his several relatives, of their claims upon his bounty, and was capable of an intelligent appreciation of their conduct towards him ; and that his final testamentary disposition was but the carrying out of a deliberate, rational, and persistent purpose, formed many months before the will.

Regarding insanity as a physical disease, we should naturally yield great respect to the opinions of medical experts upon the subject ; but the evidence of the distinguished physicians who have testified in regard to Bowditch's insanity, is robbed of all value, on account of its generality, and the failure to direct their attention to the particular kind and degree of mental impairment which destroy the will-making power.

We venture to say that not one of them could read Bowditch's will, and his numerous letters written prior to, contemporaneously with, and subsequent to its date, without admitting that his disease had not deprived him of the degree of intellectual capacity which we have indicated as sufficient to sustain a will. The human mind is the mystery of mysteries, and the shadowy confines, which separate the sanity of insane men from the insanity of sane men, are peopled with infinite perplexities. Swedenborg, Pascal, Luther, Ben Jonson, Goethe, Brougham, Napoleon

Bonaparte, and many other eminent men, were the subjects of delusions or eccentricities, difficult to reconcile with perfect intellectual health. On the other hand, the books are full of cases of persons undoubtedly insane in some respects, who, at some times, and in regard to many subjects, manifest the most wholesome sanity.

The presumptions of the law are in favor of capacity. These must be rebutted by conclusive proofs. Doubts must be resolved in favor of the will. In the case at bar, the evidence satisfies us that the testator was of sound mind, within the meaning of the law, and with reference to the testamentary act, and that his will should be sustained.

Rehearing refused.